DORSEY & WHITNEY LLP
Bruce R. Ewing (BE-0724)
Helene M. Freeman (HF-3066)
Marc S. Reiner (MR-6669)
250 Park Avenue
New York, NY 10177
(212) 415-9200

Attorneys for Defendants
Doubledown Media, LLC and Randall Lane

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TPC OPERATING, LLC and LENNY DYKSTRA,<br><br>        Plaintiffs,<br><br>  -against-<br><br>DOUBLEDOWN MEDIA, LLC and RANDALL LANE,<br><br>        Defendants. | 08 Civ. 3912 (RB)<br><br>**ANSWER AND COUNTERCLAIMS**<br><br><br>**JURY TRIAL DEMANDED** |
| DOUBLEDOWN MEDIA, LLC,<br><br>    Counterclaimant,<br><br>  -against-<br><br>TPC OPERATIONS, LLC and LENNY DYKSTRA,<br><br>    Counterclaim-Defendants. | |

   Defendants-Counterclaimants Doubledown Media, LLC ("Doubledown") and Randall

Lane ("Lane"), as and for their Answer and Counterclaims to the April 25, 2008 Complaint (the

"Complaint") filed by Plaintiffs TPC Operations, LLC (misidentified by plaintiffs in the caption

of this action as "TPC Operating LLC" ("TPC") and Lenny Dykstra ("Dykstra"), hereby assert

as follows:

**ANSWER**

1.      Doubledown and Lane admit the allegations contained in paragraphs 1, 2, 4, 5, 6, 8 and 9 of the Complaint.

2.      In response to the allegations contained in paragraphs 3 and 7 of the Complaint, Doubledown and Lane admit that Doubledown is a limited liability company with its principal place of business in New York, New York.  Doubledown and Lane deny the remainder of the allegations contained in paragraphs 3 and 7 of the Complaint.

3.      In response to the allegations contained in paragraph 10 of the Complaint, Doubledown and Lane admit that the asserted value of the claims asserted against them by TPC and Dykstra exceeds $75,000 and deny liability on such claims.

4.      In response to the allegations contained in paragraphs 11 and 12 of the Complaint, Doubledown and Lane admit that jurisdiction and venue in this Court are proper.

5.      Doubledown and Lane deny the allegations contained in paragraphs 13 through 15 of the Complaint.

6.      Doubledown and Lane admit the allegations contained in paragraph 16 of the Complaint.

7.      In response to the allegations contained in paragraph 17 of the Complaint, Doubledown and Lane admit that, on April 20, 2008 and for many months prior to that time, Doubledown had demanded payment of sums owed to it by TPC and Dykstra.  Doubledown and Lane deny the remaining allegations contained in paragraph 17 of the Complaint.

8.      In response to the allegations contained in paragraph 18 of the Complaint, Doubledown and Lane admit that TPC and Dykstra have at various times both acknowledged and disputed all or part of their payment obligations owed to Doubledown and have made

various, wrongful demands of Doubledown. The validity of such demands and the remaining allegations of paragraph 18 of the Complaint are denied by Doubledown and Lane.

9.    In response to the allegations contained in paragraph 19 of the Complaint, Doubledown and Lane admit that Doubledown has refused various demands made by TPC and Dykstra regarding the publication of the second issue of *The Players Club*, including demands for the release of materials that are the property of Doubledown until they are paid for, and deny the remaining allegations of this paragraph.

10.    Doubledown and Lane deny the allegations contained in paragraphs 20 and 21 of the Complaint.

11.    In response to the allegations contained in paragraph 22 of the Complaint, Doubledown and Lane repeat and reallege all of their responses in paragraphs 1 through 10 above as if fully set forth herein.

12.    Doubledown and Lane deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 23 of the Complaint.

13.    Doubledown and Lane deny the allegations contained in paragraphs 24 through 27 of the Complaint.

14.    In response to the allegations contained in paragraphs 28 and 29 of the Complaint, Doubledown and Lane admit that they were apprised by TPC and Dykstra of the intended engagement of American Express Publishing to perform publishing services in connection with *The Players Club* magazine but deny any knowledge or information sufficient to form a belief as to the nature of such engagement and deny the remaining allegations contained in these paragraphs.

15.     In response to the allegations contained in paragraph 30 of the Complaint, Doubledown and Lane admit that Doubledown's counsel sent a letter to American Express Publishing on or about April 22, 2008 advising, *inter alia*, that the relationship between Doubledown, TPC and Dykstra had not terminated and deny that such letter contained any false statements or that such letter "sought to disrupt TPC's business relationship" with American Express Publishing and deny the remaining allegations contained in that paragraph.

16.     Doubledown and Lane deny the allegations contained in paragraphs 31 and 32 of the Complaint.

17.     In response to the allegations contained in paragraph 33 of the Complaint, Doubledown and Lane repeat and reallege all of their responses in paragraphs 1 through 16 above as if fully set forth herein.

18.     Doubledown and Lane deny the allegations contained in paragraphs 34 through 39 of the Complaint.

19.     In response to the allegations contained in paragraph 40 of the Complaint, Doubledown and Lane repeat and reallege all of their responses in paragraphs 1 through 18 above as if fully set forth herein.

20.     Doubledown and Lane deny the allegations contained in paragraph 41 of the Complaint.

21.     Doubledown and Lane deny all allegations contained in paragraph 42 of the Complaint except for the allegation that Doubledown began working with Dykstra in 2007 on an investment newsletter to be called *The Dykstra Report* to be marketed to consumers interested in investment strategies, which allegation is admitted.

22.     Doubledown and Lane deny the allegations contained in paragraph 43 of the Complaint.

23.     In response to the allegations contained in paragraph 44 of the Complaint, Doubledown and Lane admit that Doubledown registered and used the Internet domain name *thedykstrareport.com* and deny the remaining allegations contained in this paragraph.

24.     Doubledown and Lane admit the allegations contained in paragraph 45 of the Complaint and aver that all activities described in this paragraph were undertaken with Dykstra's full knowledge and approval.

25.     In response to the allegations contained in paragraph 46 of the Complaint, Doubledown and Lane admit the allegations contained in the first sentence of this paragraph and deny the allegations contained in the second sentence of this paragraph.

26.     Doubledown and Lane deny the allegations contained in paragraphs 47 through 51 of the Complaint.

27.     In response to the allegations contained in paragraph 52 of the Complaint, Doubledown and Lane repeat and reallege all of their responses in paragraphs 1 through 26 above as if fully set forth herein.

28.     Doubledown and Lane deny the allegations contained in paragraphs 53 through 57 of the Complaint.

## <u>AFFIRMATIVE DEFENSES</u>

1.     The Complaint fails to state claims upon which relief may be granted.

2.     Lane is not a party to any contract described in the Complaint. All of Lane's actions in connection with any matter related to TPC or Dykstra were performed solely in his capacity as President of Doubledown.

3.      Any performance required by Doubledown under its agreements with TPC and Dykstra was excused by the failure of TPC and Dykstra to satisfy a condition precedent, namely paying Doubledown for its services.

## COUNTERCLAIMS

Doubledown, as and for its Counterclaims against TPC and Dykstra, hereby asserts as follows:

### Introduction

1.      The counterclaims set forth below arise from a business relationship between Doubledown, a successful publisher of targeted professional-oriented luxury magazines, and TPC, a nascent company owned and controlled by Lenny Dykstra, a former major league baseball player turned entrepreneur.  For approximately nine months in 2007 and 2008, Doubledown worked together with TPC and Dykstra to develop specialty publications, including a periodical magazine entitled *The Players Club* and an investment newsletter entitled *The Dykstra Report*.  *The Players Club* was intended for distribution to professional athletes and was to contain articles and information concerning finance, investments, lifestyle choices and other subjects of interest to that high-end market.  *The Dykstra Report* was to have been marketed to individual consumers with an interest in Dykstra's investment advice.

2.      The relationship between Doubledown and TPC, which began in 2007 with much optimism about the future success of *The Players Club* magazine and the eventual launch of *The Dykstra Report*, rapidly soured in 2008.  Over a relatively short period of time, Dykstra proved himself to be a mercurial, difficult client whose many idiosyncrasies and demanding personality imposed substantial costs on the planned publications and created excessive burdens for Doubledown.  At the same time, Dykstra began shirking his financial obligations to Doubledown

beginning in late 2007 and continuing into 2008, repeatedly driving up expenses and increasing the overall costs of the publications at a time when he, on information and belief, lacked the cash to pay for such expenses.

3.      By April 2008, weary of the many problems Dykstra had created in the relationship, Doubledown suggested that the parties work out a settlement to resolve most of their relationship following publication of the second issue of *The Players Club* magazine that Doubledown had created and readied for printing.  Doubledown's willingness to agree to such a resolution and to proceed with the printing and distribution of the second issue of *The Players Club* magazine, which Dykstra was late in paying for, was conditioned on the immediate payment by TPC and Dykstra of the compromise sum of $328,000 owed to Doubledown under the parties' contracts that TPC and Dykstra had never paid.  Another $200,000 would be paid within thirty days to cover non-production costs associated with the third issue, incurred as a consequence of Doubledown's commencement of work on that issue.  After initially agreeing to such a resolution on the terms proposed by Doubledown and to pay what they owed, TPC and Dykstra went back on their word and began an aggressive campaign to wrongfully induce not just Doubledown, but also the printer with which Doubledown had contracted to print the second issue of *The Players Club* and others to release the content of that issue to TPC and Dykstra without payment.  The apparent failure of this campaign prompted the filing of this lawsuit, which is yet a further effort by TPC and Dykstra to obtain the second issue of *The Players Club*, which was created by Doubledown, without having to pay for it.

## The Parties, Jurisdiction and Venue

4.      Doubledown is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at 240 West 35th Street, 11th Floor, New York, New York 10001.

5.      Upon information and belief, TPC is a limited liability company organized and existing under the laws of the State of California with its principal place of business located in the State of California.

6.      Upon information and belief, Dykstra is an individual who resides in Thousand Oaks, California who is either the sole or the majority owner of TPC and who holds himself out as the President and CEO of "The Players Club," which is a d/b/a for TPC.

7.      Doubledown asserts herein counterclaims for breach of contract, *quantum meruit*, unjust enrichment and promissory estoppel.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000.

8.      Upon information and belief, this Court has personal jurisdiction over TPC and Dykstra pursuant to New York CPLR §§ 301 and 302.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and (c).

## The Inception of the Relationship Between Doubledown, TPC and Dykstra

9.      Doubledown is a successful publisher of profession-based publications aimed at a high-end clientele.  Among the titles it publishes are *Trader Monthly*, directed at traders and hedge fund managers; *Dealmaker*, for private equity executives, venture capitalists and investment bankers; *Private Air*, a publication marketed to the owners of private aircraft and

their passengers; and *Corporate Leader*, whose readership consists of more than 100,000 CEOs and CFOs, among other corporate executives.

10.     In approximately July 2007, Doubledown was approached by TPC and Dykstra concerning the possibility of publishing *The Players Club* magazine. Dykstra is a former professional baseball player for the New York Mets and Philadelphia Phillies. Following the end of his professional baseball career, Dykstra became an entrepreneur working in a variety of fields, including offering published investment advice.

11.     Among Dykstra's businesses in 2007 was TPC, d/b/a The Players Club. As explained to Doubledown, Dykstra had conceived of The Players Club as an organization that would offer investment and other services to current and former professional athletes in collaboration with various third-parties, including financial services firms. As part of his vision for The Players Club, Dykstra wanted to publish a high-end magazine called *The Players Club* that would contain financial and lifestyle information and advice aimed at professional athletes. The magazine would also contain advertisements sponsored by companies with products and services of potential interest to such a wealthy readership, including airline companies, financial services companies, resorts, automobile manufacturers and others.

12.     Upon information and belief, Dykstra needed an experienced magazine publisher to get *The Players Club* off the ground, and after discussions that took place during the summer of 2007, Doubledown and TPC/Dykstra began to work together on the magazine. When the relationship began, both parties were full of optimism about the eventual success of their venture, with Dykstra even advising Doubledown's President, Randall Lane, by email on July 30, 2007 that "You are the kind of person that I WANT to partner up with; by the way, *we are partnering up . . . . and I never lose money for my partners, as it is unacceptable!*"" (Emphasis in original.)

13.    From its inception, the relationship between Doubledown, TPC and Dykstra extended beyond *The Players Club*.  Beginning in 2007, Dykstra started taking advantage of Doubledown's excellent reputation and contacts in the financial services industry to further develop TPC's business.  Specifically, Doubledown set up meetings for Dykstra with firms such as Merrill Lynch, Citigroup and Alliance Bernstein and also attended meetings with Dykstra at firms such as AIG and Bank of America with which Dykstra wished to partner so that TPC could offer investment management and other services to professional athletes.  Doubledown further assisted Dykstra in developing marketing and sales materials for TPC.

14.    In addition, in October 2007, Doubledown suggested to Dykstra the concept of an investment newsletter that would contain Dykstra's thoughts and advice about investment opportunities.  Dykstra quickly became excited about the idea and asked Doubledown to work jointly with him on creating such a publication, referred to as *The Dykstra Report*.

15.    Prior to October 22, 2007, there was no written contract between the parties, but they executed a "Letter of Agreement" on that date limited to *The Players Club* publication.  A copy of the Letter of Agreement executed by the parties on October 22, 2007 (the "Contract") is attached as Exhibit A.  In general terms, the Contract committed the parties to work together on one year of publishing *The Players Club* (six issues).  Doubledown was to be responsible for developing the content of the publications; contracting for the printing and distribution of the publications; selling advertising (with advertising revenues to be split equally between the parties); and creating marketing and sales materials.  TPC and Dykstra were obliged to supply ideas for content, provide addresses for potential subscribers and approve the content created by Doubledown.

16.    In addition, and most importantly, TPC and Dykstra were required to pay

Doubledown for all costs of creating, developing, publishing, printing and distributing *The*

*Players Club* magazine.  The Contract required payments of $100,000 on execution, another

$100,000 by October 31, 2007, $260,000 by December 31, 2007 and $360,000 by February 15,

2008, with additional payments due thereafter.  Dykstra had previously written to Doubledown:

"It is very important for me that you know: You can count on being paid, that I can guarantee!"

"Money will not be an issue, I don't want you to worry about that part of the equation."

Notwithstanding the parties' clear understanding in the Contract in October 2007 that TPC and

Dykstra would pay Doubledown $820,000 by the end of February 2008, only $650,000 has ever

been paid to Doubledown.  Further payments owed by TPC and Dykstra under the Contract as

subsequently amended have never been paid as well.

### The Failure of the Relationship Between Doubledown, TPC and Dykstra

17.    In late December 2007, problems began to surface in the relationship between

Doubledown, TPC and Dykstra.  When Doubledown requested payment from TPC and Dykstra

in late December 2007 of the $260,000 that the Contract specified was due before December

31st, Dykstra began to exhibit apparent cash-flow problems that would later result in a series of

failures to pay or pay timely amounts he and TPC owed to Doubledown.

18.    At various points during the parties' relationship, Dykstra had turned to

Doubledown and its extensive financial contacts for help with his personal and business finances.

Dykstra enlisted Doubledown to raise cash for Dykstra, either by helping him secure a loan

against his newly-purchased house or else selling a promissory note for which he had traded his

car wash business and that paid him monthly interest over 10 years, which Doubledown

endeavored to do.  Starting in the fall of 2007, Dykstra asked Doubledown if it could set up

meetings for him with potential lenders and copied Doubledown on his own correspondence with such potential lenders. Dykstra also asked Doubledown if he and TPC could piggy-back off the line of credit a finance company had extended to Doubledown for its publishing business. Doubledown assisted Dykstra to the extent it reasonably could by, *inter alia*, trying to help him secure loans. In early 2008, Doubledown also loaned Dykstra/TPC $59,000 to pay vendors for services unrelated to *The Players Club* magazine.

19.    At the same time that Doubledown came to believe that Dykstra's financial problems were mounting, Dykstra made a series of demands that significantly increased the expenses of *The Players Club* magazine, notwithstanding Doubledown's efforts to hold down costs and dissuade Dykstra from the profligate course of action he was pursuing. Among other things, Dykstra insisted that the magazine launch as a monthly, rather than the more financially conservative approach of publishing every two months that was agreed to in the Contract. Dykstra also insisted that the magazine be published in a much larger physical size, using far more expensive paper and running almost twice as many pages than the parties had agreed to in the Contract. In addition, Dykstra insisted on creating a separate Spanish-language edition of *The Players Club* at a substantial cost, complete with Spanish language ads, despite the fact that this edition would only reach a few hundred readers. Finally, even though Doubledown was paying for a separate design staff, Dykstra hired an extra design "consultant", specifically *Time* magazine design director Arthur Hochstein, who in turn brought in *Time's* photography director to assist him. Together, the *Time* magazine duo spent hundreds of hours working with Dykstra and generated tens of thousands of dollars in unnecessary costs, such as a single assignment that alone cost almost $60,000. Also, against Doubledown's strong recommendation, Dykstra approved spending more than $400,000 on a launch party for the magazine.

20.    As costs mounted because of Dykstra's requests for extraordinary and unnecessary spending, which Doubledown repeatedly counseled Dykstra against and which caused numerous disputes between the parties, Doubledown, TPC and Dykstra agreed in early 2008 to modify the Contract.  Under the modified Contract, Doubledown would invoice TPC and Dykstra for all costs Doubledown incurred as a consequence of payments Doubledown made to all of its vendors and suppliers to whom Doubledown was solely responsible under its own contracts with them.  Doubledown would also receive a $50,000 per-issue management fee that would cover, *inter alia*, the costs of Doubledown's two top editors and a senior project manager. The parties agreed that each month, before the subsequent month's issue printed, Doubledown would submit its estimate on the 6th, for payment between the 9th and the 11th.

21.    Unfortunately, when it came to making these agreed-upon payments in February and March, Dykstra and TPC proved very difficult.  Dykstra and TPC were given itemized bills and spreadsheets on January 15, January 23, January 28, February 4, March 7, March 21, March 21, March 26, April 8 and April 14 , documenting every specific cost. The cost ledger was also perpetually updated and annotated with all third-party services contracted for by Doubledown and was regularly provided to Dykstra and TPC.  Notwithstanding, Dykstra and TPC failed to make the agreed-upon payments or, when they did, did so well beyond commercially reasonable grace periods and in lesser amounts than had been agreed to and billed.  At all times, Doubledown offered to show Dykstra any backup documentation he requested and even made Dykstra a standing offer, confirmed in writing, to audit Doubledown's books and invoices to confirm that Doubledown had reported its costs accurately.  TPC and Dykstra never responded to this offer and have never disputed with specificity the legitimacy or accuracy of any of the line items for which Doubledown has sought reimbursement.

22.    Notwithstanding the many problems that had developed in the relationship, the parties were able to publish the first issue of *The Players Club* in April 2008.  In addition, they also continued their work on the investment services newsletter Dykstra wanted to develop jointly with Doubledown under the name *The Dykstra Report*, and they entered into an oral agreement concerning that publication.  As memorialized in an email from Lane to Dykstra dated March 20, 2008 that is attached as Exhibit B, Doubledown and Dykstra had agreed by that date on provisions dividing advertising revenue, setting the contract term and specifying who would create content for *The Dykstra Report*.

23.    In furtherance of the parties' oral agreement, Dykstra provided Doubledown with thousands of emails from people who had written to him about his stock picks and asked that Doubledown solicit subscriptions from them to *The Dykstra Report*.  With Dykstra's approval, Doubledown also registered *www.thedykstrareport.com* as a domain name at which a future website for the planned newsletter would be accessible.  Doubledown also hired an editor, again with Dykstra's approval, to create content for the planned newsletter, and that writer began working directly with Dykstra and Dykstra's counsel on the production of *The Dykstra Report*.  (Dykstra also used this editor to draft and edit some of his investment advice columns published on *thestreet.com*.)  At Dykstra's insistence, Doubledown began negotiations to pay Richard Suttmeier, a stock analyst who, upon information and belief, provided Dykstra lists of recommended stocks daily, in connection with contributions it was anticipated he would make to *The Dykstra Report*.  Dykstra himself proposed in writing that the newsletter be launched on or about April 1, 2008, and a pre-launch version of the publication's website was created and made accessible in approximately March 2008 in contemplation of such launch.  In addition, Doubledown, again acting at Dykstra's initiative, began soliciting subscriptions for *The Dykstra*

*Report* in approximately March 2008 and also arranged for a television appearance by Dykstra on HBO at which *The Dykstra Report* would be promoted. All of the marketing and development efforts undertaken for *The Dykstra Report* were paid for exclusively by Doubledown in reliance on Dykstra's clear and unambiguous promises that he would collaborate with Doubledown on that publication.

24.     By the end of March 2008, TPC and Dykstra owed Doubledown substantial sums of money. Under the Contract, as modified in early 2008, TPC and Dykstra owed Doubledown $487,210, consisting of unpaid expenses incurred in connection with the production of the first and second issue of *The Players Club* magazine, unpaid expenses incurred and fees owed in connection with the non-production services for the third issue of *The Players Club* magazine, and unreimbursed funds advanced on behalf of Dykstra to cover items such as expenses for the lavish launch party insisted on by Dykstra and TPC for *The Players Club* magazine. Further, Dykstra owed Doubledown approximately $100,000 as reimbursement for expenses incurred in connection with the development of *The Dykstra Report.*

25.     As a consequence of these arrears and a pattern of disturbing behavior on Dykstra's part concerning his maladministration of TPC and its business that seemed unlikely to change, Doubledown concluded that it would be best for the parties to part company and suggested to Dykstra that they ought to resolve their relationship. On April 14, 2008, at a face-to-face meeting in New York, the parties orally agreed that their relationship would cease as to *The Players Club* after publication of the second issue, subject to certain conditions, but continue as to *The Dykstra Report.* Doubledown agreed to accept a final payment from Dykstra and TPC of $328,000 to cover all of its costs incurred in connection with the creation, development, production and distribution of the first and second issues of *The Players Club,* as well as

outstanding loans made to Dykstra, plus another $200,000 to cover the non-production costs of the third issue whose development had already begun. Doubledown also agreed that, following its receipt of the $328,000 payment, it would publish and distribute the second issue of *The Players Club*, and work with Dykstra and TPC to publish the third issue of *The Players Club* magazine through American Express Publishing, the new publisher Dykstra said he and TPC had engaged.

26.     Notwithstanding the April 14th oral agreement, TPC and Dykstra never paid the compromise sum of $328,000 they had agreed to pay. Dykstra confirmed to Doubledown on April 15th that he was in fact making arrangements to get the cash to Doubledown imminently. When the wire did not arrive, Doubledown called Dykstra on Thursday April 17th, but the call was not returned. With the issue scheduled to print on Monday April 21st, Doubledown emailed Dykstra on April 20th seeking assurances from him and TPC that they would perform their obligations related to the agreed-upon sum. Subsequently, at a time when Doubledown was up against a hard deadline to proceed with printing and at the point of its maximum economic vulnerability, Dykstra and TPC, through counsel, advised that they would not honor their prior commitments, taking the position that Doubledown was not entitled to the agreed-upon payment before the second issue of *The Players Club* was published and further contending that this payment was conditioned on Doubledown providing Dykstra with financial information that Doubledown had, in fact, previously provided, with a standing offer for a full audit that had never been responded to or accepted.

27.     When Doubledown rejected Dykstra's and TPC's contentions, Dykstra undertook an extraordinary campaign to procure publication of the second issue. Among other things, Dykstra's and TPC's counsel threatened Doubledown with litigation if the second issue was not

published immediately before any payment of the long-overdue amounts. Upon information and belief, Dykstra personally visited the Pennsylvania offices of the printer engaged by Doubledown and unlawfully attempted to persuade the printer to print the second issue of *Players Club* without Doubledown's authorization. Since Doubledown is the only party that has ever contracted with the printer of *The Players Club* magazine and is solely responsible for all financial obligations owed to that printer, Dykstra's demands were completely out of line and represented an effort to disrupt Doubledown's business. When his effort to pressure the printer failed, Dykstra tried to induce the printer to provide him with the electronic designs and electronic and non-electronic materials that could be used to create the second issue of *The Players Club*, content and material that was created by Doubledown and its contractors and that belongs to Doubledown until it is paid for. Upon information and belief, Dykstra also made efforts to induce others to supply him with the second issue of *The Players Club* without Doubledown's authorization and tried – and is continuing to try – to contract with a printer to print the issue, despite the fact that Doubledown produced it and that Dykstra had specifically, in writing, insisted that Doubledown was liable for creative costs.

28.    In light of the apparent failure of these efforts and Doubledown's continued insistence that it be paid for the work it has undertaken, Dykstra and TPC commenced this litigation.

## COUNT I

### Breach of Contract – *The Players Club*

29.    Doubledown repeats and realleges each and every allegation set forth in paragraphs 1 through 28 hereof as if fully set forth herein.

30.     Doubledown is party to a written contract with TPC and Dykstra dated October 22, 2007 concerning *The Players Club* publication that was orally modified in early 2008.

31.     Doubledown has performed all of the obligations required under its October 22, 2007 contract with TPC and Dykstra, as modified, incurring substantial costs for which TPC and Dykstra are responsible.

32.     TPC and Dykstra breached their obligations to Doubledown under the parties' October 22, 2007 contract, as modified, by failing to pay the sums required under the Contract.

33.     As a consequence of such breach, Doubledown is owed substantial sums exceeding $487,210, together with pre-judgment and post-judgment interest, such costs as may be allowed by law and such other and further relief as to the Court may be just and proper.

## COUNT II

### Breach of Contract – *The Dykstra Report*

34.     Doubledown repeats and realleges each and every allegation set forth in paragraphs 1 through 33 hereof as if fully set forth herein.

35.     Doubledown entered into an oral contract with TPC and Dykstra concerning publication of *The Dykstra Report*.

36.     Doubledown has performed all of the obligations required under its oral contract with TPC and Dykstra, incurring substantial costs for which TPC and Dykstra are responsible.

37.     TPC and Dykstra breached their obligations to Doubledown under the parties' oral contract by failing to pay the sums required under the contract.

38.     As a consequence of such breach, Doubledown is owed substantial sums exceeding $100,000, together with pre-judgment and post-judgment interest, such costs as may be allowed by law and such other and further relief as to the Court may be just and proper.

## COUNT III

### **Quantum Meruit**

39.     Doubledown repeats and realleges each and every allegation set forth in paragraphs 1 through 38 hereof as if fully set forth herein.

40.     Between July 2007 and April 2008, Doubledown rendered services in good faith to TPC and Dykstra in connection with *The Players Club* magazine, some of which, such as loans made to Dykstra and advances made on his behalf were outside the scope of the parties' modified October 22, 2007 contract, as well as *The Dykstra Report* newsletter.

41.     TPC and Dykstra accepted the services rendered in good faith by Doubledown in connection with *The Players Club* magazine and *The Dykstra Report* newsletter.

42.     Doubledown reasonably expected to be compensated by TPC and Dykstra for the services it rendered in connection with *The Players Club* magazine and *The Dykstra Report* newsletter.

43.     The reasonable value of the services Doubledown rendered in connection with *The Players Club* magazine and *The Dykstra Report* newsletter, which sum remains unpaid by TPC and Dykstra, is in excess of $587,210.

44.     As a consequence of the foregoing, Doubledown is entitled to recover damages exceeding $587,210, together with pre-judgment and post-judgment interest, such costs as may be allowed by law and such other and further relief as to the Court may be just and proper.

## COUNT IV

### **Unjust Enrichment**

45.     Doubledown repeats and realleges each and every allegation set forth in paragraphs 1 through 44 hereof as if fully set forth herein.

46.    TPC and Dykstra have received benefits to which they are not entitled as a consequence of the services rendered on their behalf by Doubledown for which compensation has not been paid.

47.    TPC and Dykstra have reaped wrongfully benefits at the expense of Doubledown by failing to pay for such services.

48.    As a consequence of the foregoing, Doubledown is entitled to recover damages exceeding $587,210, together with pre-judgment and post-judgment interest, such costs as may be allowed by law and such other and further relief as to the Court may be just and proper.

**COUNT V**

**Promissory Estoppel**

49.    Doubledown repeats and realleges each and every allegation set forth in paragraphs 1 through 48 hereof as if fully set forth herein.

50.    Dykstra and TPC made clear and unambiguous promises to Doubledown that they would be responsible for all reasonable costs incurred by Doubledown with respect to the creation, development, printing, distribution, advertising, promotion and sale of *The Players Club* magazine and *The Dykstra Report* newsletter.

51.    In reliance on such promises, which reliance was foreseeable by Dykstra and TPC, Doubledown incurred substantial costs in the creation, development, printing, distribution, advertising, promotion and sale of *The Players Club* magazine and *The Dykstra Report* newsletter.

52.    As a consequence of such reliance and the failure of TPC and Dykstra to reimburse Doubledown for all of its reasonable costs incurred in the creation, development,

printing, distribution, advertising, promotion and sale of *The Players Club* magazine and *The Dykstra Report* newsletter, Doubledown has suffered substantial damages.

53.     As a consequence of the foregoing, Doubledown is entitled to recover damages exceeding $587,210, together with pre-judgment and post-judgment interest, such costs as may be allowed by law and such other and further relief as to the Court may be just and proper.

WHEREFORE, Doubledown prays that this Court:

1.     Award Doubledown monetary damages in the amount of no less than $587,210, together with both pre-judgment and post-judgment interest and all costs allowable by law.

2.     Award Doubledown such other and further relief as the Court deems just and proper.

## JURY DEMAND

Doubledown hereby demands a trial by jury on all of its counterclaims to the extent allowed by law and the U.S. Constitution.

Dated:   New York, New York                    DORSEY & WHITNEY LLP
         April 28, 2008


                                         By:_____S/_____
                                            Bruce R. Ewing (BE-0724)
                                            Helene M. Freeman (HF-3066)
                                            Marc S. Reiner (MR-6669)
                                            250 Park Avenue
                                            New York, New York 10177
                                            (212) 415-9200

                                            Attorneys for Defendants
                                            Doubledown Media, LLC and Randall Lane

# EXHIBIT A

 



October 22, 2007

Mr. Lenny Dykstra
Players Club
510 Walnut Street, Suite 500
Philadelphia, PA 19106

Lenny:

Thank you for an excellent meeting yesterday. This is a very exciting stage in the Players Club Magazine process and we are looking forward to working with you and your associates to bring the magazine to fruition.

This Letter of Agreement outlines the understanding, deal points and responsibilities of the working relationship between Doubledown Media and Players Club as we move forward in the development, execution and the March 1, 2008 launch of Players Club Magazine. When signed by you, this letter will allow us to proceed while we prepare a more formal contract.

## Players Club Responsibilities

**Circulation Development**
Players Club will provide Doubledown Media with the names and addresses for bulk shipping and individual delivery to players in accordance with the circulation timetable.

**Content Input**
Players Club will provide content suggestions and input from the magazine sponsors in accordance with the content timetables. Doubledown Media will adjust that input to fit the tone and flow of the magazine.

**Prompt Approvals**
Players Club will provide approvals in a timely manner in order to accommodate the content development and circulation timetables. Detailed timetables are forthcoming.

## Doubledown Media Responsibilities

**Content**
Doubledown Media will provide original content, as well as edited sponsor content, to Players Club in a timely manner in order to accommodate production timetables. Content includes editorial, design, photography and illustration.

**Distribution**
Based on the circulation input from Players Club, Doubledown Media will execute all distribution of the magazine.

**Advertising Sales and Revenue Sharing**
Doubledown Media will allocate its national advertising sales network to generate advertising revenue from non-partnership companies. Net advertising revenue will be split equally between Players Club and Doubledown Media.

**Marketing Materials**
Doubledown media will assume the development and production of marketing and sales materials necessary to launch the magazine. You will have full approval of the work as it proceeds. Should Players Club want to launch the magazine with a party/event, $25,000 would be pre-paid to cover partial event costs.



**DOUBLEDOWN MEDIA**

*The very best materials must be used, this is very important to me. Thank you*

*Lenny, Understood. We'll show you samples the stocks for you approval. Thanks, Jim*

## Issue Specifications

| | |
|---|---|
| Frequency: | Six times annually |
| Quantity: | 20,000 |
| Trim Size: | 9 inches x 10.8 inches |
| Paper Stock: | Cover/100# Appleton Utopia |
| | Text/45# Bowater Bowbrite |
| Coloration: | Four-color process throughout |
| Paging: | 96 pages + four covers (including 30 advertising pages) |
| Binding: | Perfect bound |
| Distribution: | 20,000 – bulk shipped, mailed and possible newsstand |

## Pricing

Marketing Costs: $100,000.
Marketing costs are due up front and cover the pre-publishing expenses for magazine template development, marketing and media kit development.
Publishing Costs: $1,440,000 / $240,000 per issue for six issues
Publishing costs cover the on-going expenditures of producing six issues of Players Magazine.

## Magazine Payment Schedule

$100,000 to cover marketing costs to be wired to Doubledown Media today
$100,000 due by October 31, 2007.
$260,000, due by December 31, 2007
$360,000, due February 15, 2008
$360,000, due May 15, 2008
$360,000, due August 15, 2008

## Foreign Language Editions

Doubledown can produce foreign language editions of the magazine as needed. Costs for translation, editorial and design rework are estimated to be $15,000 per issue. Production, postage and distribution costs will vary depending on quantity for each country.

Lenny, please let me know if there are any questions, comments or changes to the Letter of agreement. We are anxious to start to work for you and to providing you with a magazine that will impress its audience, its sponsors and that you will be very proud of.

Sincerely,

James M. Gabal
Managing Director, Custom Media, Doubledown Media, LLC

Approved for Players Club by:

Lenny Dykstra                    PRESIDENT              10/22/07
Lenny Dykstra                    Title                  Date

Approved for Doubledown Media, LLC by:

                                                        10-22-07
Randall Lane                     President              Date

# EXHIBIT B

```
------ Forwarded Message
From: Randall Lane ████████████████████
Date: Thu, 20 Mar 2008 18:14:28 -0400
To: Lenny Dykstra ████████████████████
Conversation: Newsletter contract
Subject: Newsletter contract
```

Lenny,

Should get the newsletter deal on paper. Here are some rough deal points, designed as always to be fair and non-controversial.

-- 50-50 split on net revenues -- this includes newsletter subscriptions, and advertising sponsorships on The Dykstra Report, which we should be successful selling to our current Trader Monthly advertisers.

-- One-year contract, but if we hit certain minimum earnings thresholds for you, it should automatically renew for another 12 months: Year 1: $500,000 for LKD; Year 2: $1 million for LKD; Year 3: $1.5 million for LKD, etc. This gives you assurances that it will be lucrative, and incentivizes us to throw every we have at this newsletter.

-- Chris Frankie will ghost-write...all you do is make the picks. But you have FINAL APPROVAL on everything that goes out under your name.

I'm sure there's lots of smaller stuff to consider, but these strike me as the main points. Our guy can draft (for free) or you can put your big legal hitters on it..best, Randall

--

Randall Lane
President and Editor-in-Chief
Doubledown Media
Trader Monthly * Dealmaker * Corporate Leader Private Air * The Cigar Report * Players Club 240 West 35th Street, 11th Floor New York, NY 10001
212-672-5173


------ End of Forwarded Message

1