DORSEY & WHITNEY LLP
Bruce R. Ewing (BE-0724)
Helene M. Freeman (HF-3066)
Marc S. Reiner (MR-6669)
250 Park Avenue
New York, NY 10177
(212) 415-9200

Attorneys for Defendants
Doubledown Media, LLC and Randall Lane

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TPC OPERATING, LLC and LENNY DYKSTRA,<br><br>          Plaintiffs,<br><br>   -against-<br><br>DOUBLEDOWN MEDIA, LLC and RANDALL LANE,<br><br>          Defendants. | 08 Civ. 3912 (RB)<br><br>**ANSWER AND SECOND AMENDED COUNTERCLAIMS**<br><br><br>**JURY TRIAL DEMANDED** |
| DOUBLEDOWN MEDIA, LLC,<br><br>       Counterclaimant,<br><br>   -against-<br><br>TPC OPERATIONS, LLC, LENNY DYKSTRA, TREND OFFSET PRINTING SERVICES, INC., MITCH SHOSTAK and SHOSTAK STUDIOS, INC.,<br><br>       Counterclaim-Defendants. | |

Defendant-Counterclaimant Doubledown Media, LLC ("Doubledown"), as and for its

Answer and Second Amended Counterclaims against Counterclaim-Defendants TPC Operations,

LLC (misidentified by plaintiffs in the caption of this action as "TPC Operating LLC" ("TPC"),

Lenny Dykstra ("Dykstra"), Trend Offset Printing Services, Inc. ("Trend Offset"), Mitch Shostak

("Shostak") and Shostak Studios, Inc. ("Shostak Studios"), hereby assert as follows:

<u>**ANSWER**</u>

1.    Doubledown and Lane admit the allegations contained in paragraphs 1, 2, 4, 5, 6, 8 and 9 of the Complaint.

2.    In response to the allegations contained in paragraphs 3 and 7 of the Complaint, Doubledown and Lane admit that Doubledown is a limited liability company with its principal place of business in New York, New York.  Doubledown and Lane deny the remainder of the allegations contained in paragraphs 3 and 7 of the Complaint.

3.    In response to the allegations contained in paragraph 10 of the Complaint, Doubledown and Lane admit that the asserted value of the claims asserted against them by TPC and Dykstra exceeds $75,000 and deny liability on such claims.

4.    In response to the allegations contained in paragraphs 11 and 12 of the Complaint, Doubledown and Lane admit that jurisdiction and venue in this Court are proper.

5.    Doubledown and Lane deny the allegations contained in paragraphs 13 through 15 of the Complaint.

6.    Doubledown and Lane admit the allegations contained in paragraph 16 of the Complaint.

7.    In response to the allegations contained in paragraph 17 of the Complaint, Doubledown and Lane admit that, on April 20, 2008 and for many months prior to that time, Doubledown had demanded payment of sums owed to it by TPC and Dykstra.  Doubledown and Lane deny the remaining allegations contained in paragraph 17 of the Complaint.

8.    In response to the allegations contained in paragraph 18 of the Complaint, Doubledown and Lane admit that TPC and Dykstra have at various times both acknowledged and disputed all or part of their payment obligations owed to Doubledown and have made

various, wrongful demands of Doubledown.  The validity of such demands and the remaining allegations of paragraph 18 of the Complaint are denied by Doubledown and Lane.

9.      In response to the allegations contained in paragraph 19 of the Complaint, Doubledown and Lane admit that Doubledown has refused various demands made by TPC and Dykstra regarding the publication of the second issue of *The Players Club*, including demands for the release of materials that are the property of Doubledown until they are paid for, and deny the remaining allegations of this paragraph.

10.      Doubledown and Lane deny the allegations contained in paragraphs 20 and 21 of the Complaint.

11.      In response to the allegations contained in paragraph 22 of the Complaint, Doubledown and Lane repeat and reallege all of their responses in paragraphs 1 through 10 above as if fully set forth herein.

12.      Doubledown and Lane deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 23 of the Complaint.

13.      Doubledown and Lane deny the allegations contained in paragraphs 24 through 27 of the Complaint.

14.      In response to the allegations contained in paragraphs 28 and 29 of the Complaint, Doubledown and Lane admit that they were apprised by TPC and Dykstra of the intended engagement of American Express Publishing to perform publishing services in connection with *The Players Club* magazine but deny any knowledge or information sufficient to form a belief as to the nature of such engagement and deny the remaining allegations contained in these paragraphs.

15.     In response to the allegations contained in paragraph 30 of the Complaint, Doubledown and Lane admit that Doubledown's counsel sent a letter to American Express Publishing on or about April 22, 2008 advising, *inter alia*, that the relationship between Doubledown, TPC and Dykstra had not terminated and deny that such letter contained any false statements or that such letter "sought to disrupt TPC's business relationship" with American Express Publishing and deny the remaining allegations contained in that paragraph.

16.     Doubledown and Lane deny the allegations contained in paragraphs 31 and 32 of the Complaint.

17.     In response to the allegations contained in paragraph 33 of the Complaint, Doubledown and Lane repeat and reallege all of their responses in paragraphs 1 through 16 above as if fully set forth herein.

18.     Doubledown and Lane deny the allegations contained in paragraphs 34 through 39 of the Complaint.

19.     In response to the allegations contained in paragraph 40 of the Complaint, Doubledown and Lane repeat and reallege all of their responses in paragraphs 1 through 18 above as if fully set forth herein.

20.     Doubledown and Lane deny the allegations contained in paragraph 41 of the Complaint.

21.     Doubledown and Lane deny all allegations contained in paragraph 42 of the Complaint except for the allegation that Doubledown began working with Dykstra in 2007 on an investment newsletter to be called *The Dykstra Report* to be marketed to consumers interested in investment strategies, which allegation is admitted.

22.     Doubledown and Lane deny the allegations contained in paragraph 43 of the Complaint.

23.     In response to the allegations contained in paragraph 44 of the Complaint, Doubledown and Lane admit that Doubledown registered and used the Internet domain name *thedykstrareport.com* and deny the remaining allegations contained in this paragraph.

24.     Doubledown and Lane admit the allegations contained in paragraph 45 of the Complaint and aver that all activities described in this paragraph were undertaken with Dykstra's full knowledge and approval.

25.     In response to the allegations contained in paragraph 46 of the Complaint, Doubledown and Lane admit the allegations contained in the first sentence of this paragraph and deny the allegations contained in the second sentence of this paragraph.

26.     Doubledown and Lane deny the allegations contained in paragraphs 47 through 51 of the Complaint.

27.     In response to the allegations contained in paragraph 52 of the Complaint, Doubledown and Lane repeat and reallege all of their responses in paragraphs 1 through 26 above as if fully set forth herein.

28.     Doubledown and Lane deny the allegations contained in paragraphs 53 through 57 of the Complaint.

## AFFIRMATIVE DEFENSES

1.     The Complaint fails to state claims upon which relief may be granted.

2.     Lane is not a party to any contract described in the Complaint. All of Lane's actions in connection with any matter related to TPC or Dykstra were performed solely in his capacity as President of Doubledown.

3.    Any performance required by Doubledown under its agreements with TPC and Dykstra was excused by the failure of TPC and Dykstra to satisfy a condition precedent, namely paying Doubledown for its services.

## COUNTERCLAIMS

Doubledown, as and for its Counterclaims against TPC, Dykstra, Trend Offset, Shostak and Shostak Studios, hereby asserts as follows:

### Introduction

1.    The counterclaims set forth below arise from a business relationship between Doubledown, a successful publisher of targeted professional-oriented luxury magazines, and TPC, a nascent company owned and controlled by Dykstra, a former major league baseball player turned entrepreneur.  For approximately nine months in 2007 and 2008, Doubledown worked together with TPC and Dykstra to develop specialty publications, including a periodical magazine entitled *The Players Club* and an investment newsletter entitled *The Dykstra Report*. *The Players Club* was intended for distribution to professional athletes and was to contain articles and information concerning finance, investments, lifestyle choices and other subjects of interest to that high-end market.  *The Dykstra Report* was to have been marketed to individual consumers with an interest in Dykstra's investment advice.

2.    The relationship between Doubledown and TPC, which began in 2007 with much optimism about the future success of *The Players Club* magazine and the eventual launch of *The Dykstra Report*, rapidly soured in 2008.  Over a relatively short period of time, Dykstra proved himself to be a mercurial, difficult client whose many idiosyncrasies and demanding personality imposed substantial costs on the planned publications and created excessive burdens for Doubledown.  At the same time, Dykstra began shirking his financial obligations to Doubledown

beginning in late 2007 and continuing into 2008, repeatedly driving up expenses and increasing

the overall costs of the publications at a time when he, on information and belief, lacked the cash

to pay for such expenses.

3.      By April 2008, weary of the many problems Dykstra had created in the

relationship, Doubledown suggested that the parties work out a settlement to resolve most of

their relationship following publication of the second issue of *The Players Club* magazine that

Doubledown had created, readied for printing and in which Doubledown owns the copyright in

the contents of the publication it created or commissioned by contract.  Doubledown's

willingness to agree to such a resolution and to proceed with the printing and distribution of the

second issue of *The Players Club* magazine, which Dykstra was late in paying for, was

conditioned on the immediate payment by TPC and Dykstra of the compromise sum of $328,000

owed to Doubledown under the parties' contracts that TPC and Dykstra had never paid.  Another

$200,000 would be paid within thirty days to cover non-production costs associated with the

third issue, incurred as a consequence of Doubledown's commencement of work on that issue.

After initially agreeing to such a resolution on the terms proposed by Doubledown and to pay

what they owed, TPC and Dykstra went back on their word and began an aggressive campaign to

wrongfully induce not just Doubledown, but also the printer with which Doubledown had

contracted to print the second issue of *The Players Club* and others to release the content of that

issue to TPC and Dykstra without payment.  The filing of this lawsuit was a further effort by

TPC and Dykstra to obtain the second issue of *The Players Club*, which was created by

Doubledown, without having to pay for it.

4.      Upon information and belief, TPC and Dykstra also engaged in improper means

to acquire the content of the second issue of *The Players Club* apart from the initiation of this

action.  Specifically, upon information and belief, TPC and Dykstra, working through Shostak

and/or Shostak Studios, were able to obtain that content without authorization and, having done

so, have entered into an agreement with Trend Offset to print and distribute the second issue in

violation of Doubledown's copyright in the contents of the publication that it created or

commissioned by contract, as well as Doubledown's contractual and other rights.

### The Parties, Jurisdiction and Venue

5.      Doubledown is a limited liability company organized and existing under the laws

of the State of Delaware with its principal place of business located at 240 West 35th Street, 11th

Floor, New York, New York 10001.

6.      Upon information and belief, TPC is a limited liability company organized and

existing under the laws of the State of California with its principal place of business located in

the State of California.

7.      Upon information and belief, Dykstra is an individual who resides in Thousand

Oaks, California who is either the sole or the majority owner of TPC and who holds himself out

as the President and CEO of "The Players Club," which is a d/b/a for TPC.

8.      Upon information and belief, Trend Offset is a corporation organized and existing

under the laws of the State of California with its principal place of business located in the State

of California.  Upon information and belief, Trend Offset has distributed the second issue of *The

Players Club* in New York and in this District.

9.      Upon information and belief, Shostak is an individual who resides in New York.

Shostak is the majority owner and creative director of Shostak Studios.

10.     Upon information and belief, Shostak Studios is a corporation organized and

existing under the laws of the State of New York with its principal place of business located in

the State of New York. Shostak Studios was retained by Doubledown in connection with providing design consulting work in connection with *The Players Club*. Shostak Studios invoiced Doubledown exclusively for its services in connection with The Players Club and was paid directly by Doubledown for such services. Upon information and belief, Shostak and Shostak Studios had also been retained by TPC and/or Dykstra to provide services in connection with *The Players Club*. Upon further information and belief, Shostak's and Shostak Studios' contract with TPC and Dykstra required that Shostak look only to Doubledown for payment.

11.     Doubledown asserts herein counterclaims for breach of contract, *quantum meruit*, unjust enrichment, promissory estoppel, unfair competition, copyright infringement, false designation of origin and false advertising. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338 and 1367..

12.     Upon information and belief, this Court has personal jurisdiction over TPC, Dykstra, Trend Offset, Shostak and Shostak Studios pursuant to New York CPLR §§ 301 and 302. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

**The Inception of the Relationship Between Doubledown, TPC and Dykstra**

13.     Doubledown is a successful publisher of profession-based publications aimed at a high-end clientele. Among the titles it publishes are *Trader Monthly*, directed at traders and hedge fund managers; *Dealmaker*, for private equity executives, venture capitalists and investment bankers; *Private Air*, a publication marketed to the owners of private aircraft and their passengers; and *Corporate Leader*, whose readership consists of more than 100,000 CEOs and CFOs, among other corporate executives.

14.     In approximately July 2007, Doubledown was approached by TPC and Dykstra concerning the possibility of publishing *The Players Club* magazine. Dykstra is a former professional baseball player for the New York Mets and Philadelphia Phillies. Following the end

of his professional baseball career, Dykstra became an entrepreneur working in a variety of fields, including offering published investment advice.

15.    Among Dykstra's businesses in 2007 was TPC, d/b/a The Players Club. As explained to Doubledown, Dykstra had conceived of The Players Club as an organization that would offer investment and other services to current and former professional athletes in collaboration with various third-parties, including financial services firms. As part of his vision for The Players Club, Dykstra wanted to publish a high-end magazine called *The Players Club* that would contain financial and lifestyle information and advice aimed at professional athletes. The magazine would also contain advertisements sponsored by companies with products and services of potential interest to such a wealthy readership, including airline companies, financial services companies, resorts, automobile manufacturers and others.

16.    Upon information and belief, Dykstra needed an experienced magazine publisher to get *The Players Club* off the ground, and after discussions that took place during the summer of 2007, Doubledown and TPC/Dykstra began to work together on the magazine. When the relationship began, both parties were full of optimism about the eventual success of their venture, with Dykstra even advising Doubledown's President, Randall Lane, by email on July 30, 2007 that "You are the kind of person that I WANT to partner up with; by the way, *we are partnering up . . . . and I never lose money for my partners, as it is unacceptable!*"" (Emphasis in original.)

17.    From its inception, the relationship between Doubledown, TPC and Dykstra extended beyond *The Players Club*. Beginning in 2007, Dykstra started taking advantage of Doubledown's excellent reputation and contacts in the financial services industry to further develop TPC's business. Specifically, Doubledown set up meetings for Dykstra with firms such as Merrill Lynch, Citigroup and Alliance Bernstein and also attended meetings with Dykstra at

firms such as AIG and Bank of America with which Dykstra wished to partner so that TPC could offer investment management and other services to professional athletes. Doubledown further assisted Dykstra in developing marketing and sales materials for TPC.

18.    In addition, in October 2007, Doubledown suggested to Dykstra the concept of an investment newsletter that would contain Dykstra's thoughts and advice about investment opportunities. Dykstra quickly became excited about the idea and asked Doubledown to work jointly with him on creating such a publication, referred to as *The Dykstra Report*.

19.    Prior to October 22, 2007, there was no written contract between the parties, but they executed a "Letter of Agreement" on that date limited to *The Players Club* publication. A copy of the Letter of Agreement executed by the parties on October 22, 2007 (the "Contract") is attached as Exhibit A. In general terms, the Contract committed the parties to work together on one year of publishing *The Players Club* (six issues). Doubledown was to be responsible for developing the content of the publications; contracting for the printing and distribution of the publications; selling advertising (with advertising revenues to be split equally between the parties); and creating marketing and sales materials. TPC and Dykstra were obliged to supply ideas for content, provide addresses for potential subscribers and approve the content created by Doubledown.

20.    In addition, and most importantly, TPC and Dykstra were required to pay Doubledown for all costs of creating, developing, publishing, printing and distributing *The Players Club* magazine. The Contract required payments of $100,000 on execution, another $100,000 by October 31, 2007, $260,000 by December 31, 2007 and $360,000 by February 15, 2008, with additional payments due thereafter. Dykstra had previously written to Doubledown: "It is very important for me that you know: You can count on being paid, that I can guarantee!"

"Money will not be an issue, I don't want you to worry about that part of the equation."
Notwithstanding the parties' clear understanding in the Contract in October 2007 that TPC and
Dykstra would pay Doubledown $820,000 by the end of February 2008, only $650,000 has ever
been paid to Doubledown. Further payments owed by TPC and Dykstra under the Contract as
subsequently amended have never been paid either.

### The Failure of the Relationship Between Doubledown, TPC and Dykstra

21.    In late December 2007, problems began to surface in the relationship between
Doubledown, TPC and Dykstra. When Doubledown requested payment from TPC and Dykstra
in late December 2007 of the $260,000 that the Contract specified was due before December
31st, Dykstra began to exhibit apparent cash-flow problems that would later result in a series of
failures to pay or pay timely amounts Dykstra and TPC owed to Doubledown.

22.    At various points during the parties' relationship, Dykstra had turned to
Doubledown and its extensive financial contacts for help with his personal and business finances.
Dykstra enlisted Doubledown to raise cash for Dykstra, either by helping him secure a loan
against his newly-purchased house or else selling a promissory note for which he had traded his
car wash business and that paid him monthly interest over 10 years, which Doubledown
endeavored to do. Starting in the fall of 2007, Dykstra asked Doubledown if it could set up
meetings for him with potential lenders and copied Doubledown on his own correspondence with
such potential lenders. Dykstra also asked Doubledown if he and TPC could piggy-back off the
line of credit a finance company had extended to Doubledown for its publishing business.
Doubledown assisted Dykstra to the extent it reasonably could by, *inter alia*, trying to help him
secure loans. In early 2008, Doubledown also loaned Dykstra/TPC $59,000 to pay vendors for
services unrelated to *The Players Club* magazine.

23.    At the same time that Doubledown came to believe that Dykstra's financial problems were mounting, Dykstra made a series of demands that significantly increased the expenses of *The Players Club* magazine, notwithstanding Doubledown's efforts to hold down costs and dissuade Dykstra from the profligate course of action he was pursuing.  Among other things, Dykstra insisted that the magazine launch as a monthly, rather than the more financially conservative approach of publishing every two months that was agreed to in the Contract. Dykstra also insisted that the magazine be published in a much larger physical size, using far more expensive paper and running almost twice as many pages than the parties had agreed to in the Contract.  In addition, Dykstra insisted on creating a separate Spanish-language edition of *The Players Club* at a substantial cost, complete with Spanish language ads, despite the fact that this edition would only reach a few hundred readers.  Finally, even though Doubledown was paying for a separate design staff, Dykstra hired an extra design "consultant", specifically *Time* magazine design director Arthur Hochstein, who in turn brought in *Time's* photography director to assist him. Together, the *Time* magazine duo spent hundreds of hours working with Dykstra and generated tens of thousands of dollars in unnecessary costs, such as a single assignment that alone cost almost $60,000.  Also, against Doubledown's strong recommendation, Dykstra approved spending more than $400,000 on a launch party for the magazine.

24.    Also in early 2008, Dykstra retained Shostak Studios to do design work in connection with *The Players Club*.  Shostak and Shostak Studios were introduced to TPC and Dykstra by Doubledown and paid through Doubledown.  Following the engagement of Shostak and Shostak Studios, Dykstra and TPC made repeated demands that Doubledown terminate such engagement, but Doubledown refused these demands.

25.     As costs mounted because of Dykstra's requests for extraordinary and unnecessary spending, which Doubledown repeatedly counseled Dykstra against and which caused numerous disputes between the parties, Doubledown, TPC and Dykstra agreed in early 2008 to modify the Contract.  Under the modified Contract, Doubledown would invoice TPC and Dykstra for all costs Doubledown incurred as a consequence of payments Doubledown made to all of its vendors and suppliers to whom Doubledown was solely responsible under its own contracts with them.  Doubledown would also receive a $50,000 per-issue management fee that would cover, *inter alia*, the costs of Doubledown's two top editors and a senior project manager. The parties agreed that each month, before the subsequent month's issue printed, Doubledown would submit its estimate on the 6th, for payment between the 9th and the 11th.

26.     Unfortunately, when it came to making these agreed-upon payments in February and March, Dykstra and TPC proved very difficult.  Dykstra and TPC were given itemized bills and spreadsheets on at least January 15, January 23, January 28, February 4, March 7, March 21, March 26, April 8 and April 14, documenting every specific cost. The cost ledger was also perpetually updated and annotated with all third-party services contracted for by Doubledown and was regularly provided to Dykstra and TPC.  Notwithstanding, Dykstra and TPC failed to make the agreed-upon payments or, when they did, did so well beyond commercially reasonable grace periods and in lesser amounts than had been agreed to and billed.  At all times, Doubledown offered to show Dykstra any backup documentation he requested and even made Dykstra a standing offer, confirmed in writing, to audit Doubledown's books and invoices to confirm that Doubledown had reported its costs accurately.  TPC and Dykstra never responded to this offer and have never disputed with specificity the legitimacy or accuracy of any of the line items for which Doubledown has sought reimbursement.

27.     Notwithstanding the many problems that had developed in the relationship, the parties were able to publish the first issue of *The Players Club* in April 2008. In addition, they also continued their work on the investment services newsletter Dykstra wanted to develop jointly with Doubledown under the name *The Dykstra Report*, and they entered into an oral agreement concerning that publication. As memorialized in an email from Lane to Dykstra dated March 20, 2008 that is attached as Exhibit B, Doubledown and Dykstra had agreed by that date on provisions dividing revenues, setting the contract term and specifying who would create content for *The Dykstra Report*.

28.     In furtherance of the parties' oral agreement, Dykstra provided Doubledown with thousands of emails from people who had written to him about his stock picks and asked that Doubledown solicit subscriptions from them to *The Dykstra Report*. With Dykstra's approval, Doubledown also registered *www.thedykstrareport.com* as a domain name at which a future website for the planned newsletter would be accessible. Doubledown also hired an editor, again with Dykstra's approval, to create content for the planned newsletter, and that writer began working directly with Dykstra and Dykstra's counsel on the production of *The Dykstra Report*. (Dykstra also used this editor to draft and edit some of his investment advice columns published on *thestreet.com*.) At Dykstra's insistence, Doubledown began negotiations to pay Richard Suttmeier, a stock analyst, to provide Dykstra with research assistance for *The Dykstra Report* and who, upon information and belief learned subsequently, provided Dykstra lists of recommended stocks daily. Dykstra himself proposed in writing that the newsletter be launched on or about April 1, 2008, and a pre-launch version of the publication's website was created and made accessible in approximately March 2008 in contemplation of such launch. In addition, Doubledown, again acting at Dykstra's initiative, began soliciting subscriptions for *The Dykstra*

*Report* in approximately March 2008 and also arranged for a television appearance by Dykstra on HBO at which *The Dykstra Report* would be promoted. All of the marketing and development efforts undertaken for *The Dykstra Report* were paid for exclusively by Doubledown in reliance on Dykstra's clear and unambiguous promises that he would collaborate with Doubledown on that publication.

29.    By the end of March 2008, TPC and Dykstra owed Doubledown substantial sums of money. Under the Contract, as modified in early 2008, TPC and Dykstra owed Doubledown $487,210, consisting of unpaid expenses incurred in connection with the production of the first and second issue of *The Players Club* magazine, unpaid expenses incurred and fees owed in connection with the non-production services for the third issue of *The Players Club* magazine, and unreimbursed funds advanced on behalf of Dykstra to cover items such as expenses for the lavish launch party insisted on by Dykstra and TPC for *The Players Club* magazine. Further, Dykstra owed Doubledown approximately $100,000 as reimbursement for expenses incurred in connection with the development of *The Dykstra Report*, and an additional $100,000 in anticipation of the revenue sharing agreement for *The Dykstra Report*.

30.    As a consequence of these arrears and a pattern of disturbing behavior on Dykstra's part concerning his maladministration of TPC and its business that seemed unlikely to change, Doubledown concluded that it would be best for the parties to part company and suggested to Dykstra that they ought to resolve their relationship. On April 14, 2008, at a face-to-face meeting in New York, the parties orally agreed that their relationship would cease as to *The Players Club* after publication of the second issue, subject to certain conditions, but continue as to *The Dykstra Report*. Doubledown agreed to accept a final payment from Dykstra and TPC of $328,000 to cover all of its costs incurred in connection with the creation, development,

production and distribution of the first and second issues of *The Players Club*, as well as outstanding loans made to Dykstra, plus another $200,000 to cover the non-production costs of the third issue whose development had already begun. Doubledown also agreed that, following its receipt of the $328,000 payment, it would publish and distribute the second issue of *The Players Club*, and work with Dykstra and TPC to publish the third issue of *The Players Club* magazine through American Express Publishing, the new publisher Dykstra said he and TPC had engaged.

31.     Notwithstanding the April 14th oral agreement, TPC and Dykstra never paid the compromise sum of $328,000 they had agreed to pay. Dykstra confirmed to Doubledown on April 15th that he was in fact making arrangements to get the cash to Doubledown imminently. When the wire did not arrive, Doubledown called Dykstra on Thursday April 17th, but the call was not returned. With the issue scheduled to print on Monday April 21st, Doubledown emailed Dykstra on April 20th seeking assurances from him and TPC that they would perform their obligations related to the agreed-upon sum. Subsequently, at a time when Doubledown was up against a hard deadline to proceed with printing and at the point of its maximum economic vulnerability, Dykstra and TPC, through counsel, advised that they would not honor their prior commitments, taking the position that Doubledown was not entitled to the agreed-upon payment before the second issue of *The Players Club* was published and further contending that this payment was conditioned on Doubledown providing Dykstra with financial information that Doubledown had, in fact, previously provided, with a standing offer for a full audit that had never been responded to or accepted.

32.     When Doubledown rejected Dykstra's and TPC's contentions, Dykstra undertook an extraordinary campaign to procure publication of the second issue, in which Doubledown

owns the copyright in the contents of the publication that it created or commissioned by contract. Among other things, Dykstra's and TPC's counsel threatened Doubledown with litigation if the second issue was not published immediately before any payment of the long-overdue amounts. Upon information and belief, Dykstra personally visited the Pennsylvania offices of the printer engaged by Doubledown and unlawfully attempted to persuade the printer to print the second issue of *The Players Club* without Doubledown's authorization. Since Doubledown is the only party that has ever contracted with the printer of *The Players Club* magazine and is solely responsible for all financial obligations owed to that printer, and the sole owner of the copyright in the contents of the publication that it created or commissioned by contract, Dykstra's demands were completely out of line and represented an effort to disrupt Doubledown's business. When his effort to pressure the printer failed, Dykstra tried to induce the printer to provide him with the electronic designs and electronic and non-electronic materials that could be used to create the second issue of *The Players Club*, content and material that was created by Doubledown and its contractors and that belongs to Doubledown.

33.    Upon information and belief, Dykstra made further efforts to induce others to supply him with the second issue of *The Players Club* without Doubledown's authorization and was ultimately successful. Upon information and belief, Dykstra and TPC, acting in bad faith, sought to induce and were able to induce Shostak and/or Shostak Studios to provide them with materials that Doubledown created, including copyrighted articles, so that the second issue of *The Players Club*, including articles created by Doubledown, could be printed and distributed without Doubledown's authorization and in violation of Doubledown's copyright, contractual and other rights. Upon information and belief, Shostak and/or Shostak Studios, notwithstanding having been specifically advised by Doubledown of Doubledown's position and its ownership of

these copyrighted materials, provided Dykstra and TPC with these materials in bad faith and with full knowledge of Dykstra's and TPC's intent to print and distribute the issue without Doubledown's authorization and in violation of Doubledown's rights and solicited bids from third-party printers on behalf of TPC and Dykstra.

34.     Upon information and belief, after obtaining the materials that Doubledown created for use in the second issue of *The Players Club*, TPC and Dykstra reached an agreement with Trend Offset to print and distribute the issue containing the materials produced and owned by Doubledown.  Upon information and belief, Trend Offset knew or should have known of Doubledown's contractual and intellectual property rights in connection with publication of *The Players Club* but nonetheless intentionally or recklessly proceeded to print and distribute *The Players Club* in bad faith in violation of those rights.

35.     A copy of excerpts from the unauthorized second issue of *The Players Club* as printed and distributed by Trend Offset (the "Second Issue") is attached hereto as Exhibit C.  The Second Issue contains articles that were created at the initiative of Doubledown by Doubledown employees, in which Doubledown owns the copyright.  Absent payment of amounts owed by TPC and Dykstra to Doubledown, TPC and Dykstra could not own any legal or other interest in such articles or in the remainder of the contents of the second issue of *The Players Club* magazine.

36.     The masthead of the Second Issue also states that the Issue was "published by TPC Operations in partnership with Doubledown Media," accompanied by the Doubledown logo, even though Doubledown never authorized the publication of the Second Issue.  Upon information and belief, the Second Issue also lists Lane as Editor-In-Chief of the magazine, even

though neither Doubledown, of which Lane is an officer, nor Lane ever authorized the publication of a second issue that used Lane's name in connection with the publication.

37.     TPC not only took Doubledown's work and described it as their own in connection with The Players Club, but they did the same with *The Dykstra Report*. As stated above, the idea for an investment newsletter that would contain Dykstra's thoughts and advice about investment opportunities originated with Doubledown. TPC and Dykstra and Doubledown then agreed to a contract and moved forward with marketing, strategy and pre-launch of The Dykstra Report. TPC and Dykstra then took Doubledown's idea and strategy for execution and launch and went on to create such an investment newsletter through TheStreet.com and named it *Nails on the Numbers*. To work on this newsletter, TPC and Dykstra have engaged the full-time Doubledown employee who was hired by Doubledown to work on *The Dykstra Report*, and pursued other strategies developed by Doubledown. As has become their pattern, TPC and Dykstra have taken the labor of Doubledown with no apparent concern for payment.

## COUNT I (AGAINST TPC AND DYKSTRA)

### Breach of Contract – *The Players Club*

38.     Doubledown repeats and realleges each and every allegation set forth in paragraphs 1 through 37 hereof as if fully set forth herein.

39.     Doubledown is party to a written contract with TPC and Dykstra dated October 22, 2007 concerning *The Players Club* publication that was orally modified in early 2008.

40.     Doubledown has performed all of the obligations required under its October 22, 2007 contract with TPC and Dykstra, as modified, incurring substantial costs for which TPC and Dykstra are responsible.

41.     TPC and Dykstra breached their obligations to Doubledown under the parties' October 22, 2007 contract, as modified, by failing to pay the sums required under the Contract.

42.    As a consequence of such breach, Doubledown is owed substantial sums exceeding $487,210, together with pre-judgment and post-judgment interest, such costs as may be allowed by law and such other and further relief as to the Court may be just and proper.

## COUNT II (AGAINST TPC AND DYKSTRA)

### Breach of Contract – *The Dykstra Report*

43.    Doubledown repeats and realleges each and every allegation set forth in paragraphs 1 through 42 hereof as if fully set forth herein.

44.    Doubledown entered into an oral contract with TPC and Dykstra concerning publication of *The Dykstra Report*.

45.    Doubledown has performed all of the obligations required under its oral contract with TPC and Dykstra, incurring substantial costs for which TPC and Dykstra are responsible.

46.    TPC and Dykstra breached their obligations to Doubledown under the parties' oral contract by failing to pay the sums required under the contract.

47.    As a consequence of such breach, Doubledown is owed substantial sums exceeding $300,000, together with pre-judgment and post-judgment interest, such costs as may be allowed by law and such other and further relief as to the Court may be just and proper.

## COUNT III (AGAINST TPC AND DYKSTRA)

### Quantum Meruit

48.    Doubledown repeats and realleges each and every allegation set forth in paragraphs 1 through 47 hereof as if fully set forth herein.

49.    Between July 2007 and April 2008, Doubledown rendered services in good faith to TPC and Dykstra in connection with *The Players Club* magazine, some of which, such as loans made to Dykstra and advances made on his behalf were outside the scope of the parties' modified October 22, 2007 contract, as well as *The Dykstra Report* newsletter.

50.    TPC and Dykstra accepted the services rendered in good faith by Doubledown in connection with *The Players Club* magazine and *The Dykstra Report* newsletter.

51.    Doubledown reasonably expected to be compensated by TPC and Dykstra for the services it rendered in connection with *The Players Club* magazine and *The Dykstra Report* newsletter.

52.    The reasonable value of the services Doubledown rendered in connection with *The Players Club* magazine and *The Dykstra Report* newsletter, which sum remains unpaid by TPC and Dykstra, is in excess of $787,210.

53.    As a consequence of the foregoing, Doubledown is entitled to recover damages exceeding $787,210, together with pre-judgment and post-judgment interest, such costs as may be allowed by law and such other and further relief as to the Court may be just and proper.

## COUNT IV (AGAINST TPC AND DYKSTRA)

### Unjust Enrichment

54.    Doubledown repeats and realleges each and every allegation set forth in paragraphs 1 through 53 hereof as if fully set forth herein.

55.    TPC and Dykstra have received benefits to which they are not entitled as a consequence of the services rendered on their behalf by Doubledown for which compensation has not been paid.

56.    TPC and Dykstra have reaped wrongfully benefits at the expense of Doubledown by failing to pay for such services.

57.    As a consequence of the foregoing, Doubledown is entitled to recover damages exceeding $787,210, together with pre-judgment and post-judgment interest, such costs as may be allowed by law and such other and further relief as to the Court may be just and proper.

## COUNT V (AGAINST TPC AND DYKSTRA)

### Promissory Estoppel

58.     Doubledown repeats and realleges each and every allegation set forth in paragraphs 1 through 57 hereof as if fully set forth herein.

59.     Dykstra and TPC made clear and unambiguous promises to Doubledown that they would be responsible for all reasonable costs incurred by Doubledown with respect to the creation, development, printing, distribution, advertising, promotion and sale of *The Players Club* magazine and *The Dykstra Report* newsletter.

60.     In reliance on such promises, which reliance was foreseeable by Dykstra and TPC, Doubledown incurred substantial costs in the creation, development, printing, distribution, advertising, promotion and sale of *The Players Club* magazine and *The Dykstra Report* newsletter.

61.     As a consequence of such reliance and the failure of TPC and Dykstra to reimburse Doubledown for all of its reasonable costs incurred in the creation, development, printing, distribution, advertising, promotion and sale of *The Players Club* magazine and *The Dykstra Report* newsletter, Doubledown has suffered substantial damages.

62.     As a consequence of the foregoing, Doubledown is entitled to recover damages exceeding $787,210, together with pre-judgment and post-judgment interest, such costs as may be allowed by law and such other and further relief as to the Court may be just and proper.

## COUNT VI (AGAINST ALL COUNTERCLAIM-DEFENDANTS)

### Copyright Infringement Under 17 U.S.C. § 501(a)

63.     Doubledown repeats and realleges each and every allegation set forth in paragraphs 1 through 62 hereof as if fully set forth herein.

64.      Articles entitled "Barry Zito: Going to Battle For The Troops" and "ROAD TRIP / World's Finest Hotel Penthouses" (the "Copyrighted Articles") were written by individuals employed by Doubledown in the course and scope of their employment, and Doubledown is the owner of the copyright in the Copyrighted Articles.

65.      The Copyrighted Articles were used in the second issue of *The Players Club* magazine published by TPC and Dykstra and printed by Trend Offset without Doubledown's authorization.

66.      Doubledown has submitted completed applications for copyright registration for the Copyrighted Articles, together with copies of the articles themselves and the necessary fees, to the Copyright Office on an expedited basis.  A copy of the copyright applications for the Copyrighted Articles is attached hereto as Exhibit D.  The Copyrighted Articles have been registered with the United States Copyright Office and were given the registration numbers TXu001575681 and TXu001575682.

67.      TPC and Dykstra knew, or had reason to know and remained willfully ignorant, that their reproduction and transmission of the Copyrighted Articles were in violation of Doubledown's rights.

68.      Shostak and/or Shostak Studios reproduced the Copyrighted Articles and knew, or had reason to know and remained willfully ignorant, that their reproduction and transmission of the Copyrighted Articles to Dykstra and TPC would result in the violation of Doubledown's rights.

69.      Trend Offset reproduced the Copyrighted Articles and knew, or had reason to know and remained willfully ignorant, that the printing of the Copyrighted Articles would result in the violation of Doubledown's rights.

70.    Counterclaim-Defendants' conduct constitutes willful and intentional copyright infringement in violation of 17 U.S.C. § 501(a).

71.    As a consequence of the foregoing, Doubledown is entitled to recover compensatory damages in an amount set by the Court, an accounting of the profits earned by the Counterclaim-Defendants, together with pre-judgment and post-judgment interest, such costs as may be allowed by law and such other and further relief as the Court may deem just and proper.

## COUNT VII (AGAINST ALL COUNTERCLAIM-DEFENDANTS)

### False Designation of Origin
### Under Section 43(a)(1) of the Lanham Act

72.    Doubledown repeats and realleges each and every allegation set forth in paragraphs 1 through 71 hereof as if fully set forth herein.

73.    Without authorization from Doubledown or Lane, Counterclaim-Defendants published the Second Issue, which falsely states that the issue was "published by TPC Operations in partnership with Doubledown Media," uses the distinctive Doubledown trademark without authorization, and lists Randall Lane as Editor-In-Chief of the magazine.

74.    Counterclaim-Defendants' actions are likely to cause confusion, or to cause mistake, or to deceive as to the origin of the Second Issue and/or falsely describe the origin of the Second Issue.

75.    TPC and Dykstra knew, or had reason to know and remained willfully ignorant, that their false statements published in the Second Issue were in violation of Doubledown's rights.

76.    Shostak and/or Shostak Studios knew, or had reason to know and remained willfully ignorant, that their transmission to Dykstra and TPC of electronic and non-electronic

materials that were created by Doubledown would result in their reproduction and transmission in violation of Doubledown's rights.

77.    Trend Offset published false statements in the Second Issue and knew, or had reason to know and remained willfully ignorant, that its printing of the Second Issue containing the false designation of origin in that issue in connection with Doubledown would be in violation of Doubledown's rights.

78.    Counterclaim-Defendants' conduct constitutes false designation of origin in violation of Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1) that has caused damage to Doubledown.

79.    As a consequence of the foregoing, Doubledown is entitled to recover compensatory damages in an amount set by the Court, an accounting of the profits earned by the Counterclaim-Defendants, and entering judgment for three times such damages and profits in view of the willful violations of Doubledown's rights, together with pre-judgment and post-judgment interest, such costs as may be allowed by law and such other and further relief as the Court may deem just and proper.

## COUNT VIII (AGAINST TPC AND DYKSTRA)

### False Advertising
### Under Section 43(a)(1) of the Lanham Act

80.    Doubledown repeats and realleges each and every allegation set forth in paragraphs 1 through 79 hereof as if fully set forth herein.

81.    On or around May 15, 2008, TPC and Dykstra have sent, or caused to be sent, an e-mail to the subscribers of *The Dykstra Report* making a series of false statements. Specifically, the e-mail stated that *The Dykstra Report* "was started without Mr. Lenny Dykstra's permission by a company named Doubledown Media."

82.     The e-mail further stated "Doubledown Media has collected your money, but provided you with no services and will **NEVER** have the ability to publish the newsletter." This statement implied that Doubledown was running a fraudulent operation that was effectively stealing money from subscribers to *The Dykstra Report*.

83.     Recipients of the e-mail were encouraged to sign up with *Nails on the Numbers*, which was described as the "real newsletter," thereby falsely implying that *The Dykstra Report* was unauthorized. As a result of the e-mail, several subscribers to *The Dykstra Report* mistakenly believed that *The Dykstra Report* was started without Dykstra's permission or otherwise without authorization and that Doubledown was engaged in criminal activity.

84.     The e-mail was sent to Doubledown's customers for the purpose of promoting and advertising *Nails on the Numbers* in an attempt to influence consumers to buy that service.

85.     The statement and implication that *The Dykstra Report* was unauthorized are materially false.

86.     TPC's and Dykstra's conduct constitutes false advertising in violation of Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1) that has caused damage to Doubledown.

87.     As a consequence of the foregoing, Doubledown is entitled to recover compensatory damages in an amount set by the Court, an accounting of the profits earned by TPC and Dykstra, and entering judgment for three times such damages and profits in view of the willful violations of Doubledown's rights, together with pre-judgment and post-judgment interest, such costs as may be allowed by law and such other and further relief as the Court may deem just and proper.

## COUNT IX (AGAINST ALL COUNTERCLAIM-DEFENDANTS)

### <u>Unfair Competition</u>

88.     Doubledown repeats and realleges each and every allegation set forth in paragraphs 1 through 87 hereof as if fully set forth herein.

89.     Upon information and belief, the Second Issue was printed using electronic and non-electronic materials that were created by Doubledown, are owned exclusively by Doubledown and are valuable assets of Doubledown that are the product of Doubledown's labor, skill and expenditures.

90.     The electronic and non-electronic materials that are owned exclusively by Doubledown and used in the Second Issue were obtained by the various Counterclaim-Defendants in bad faith.

91.     Counterclaim-Defendants misappropriated Doubledown's property through their use of Doubledown's electronic and non-electronic materials in the Second Issue in bad faith and without authorization from Doubledown.

92.     Counterclaim-Defendants' conduct constitutes unfair competition under the common law of the State of New York that has caused damage to Doubledown.

93.     As a consequence of the foregoing, Doubledown is entitled to recover compensatory damages in an amount set by the Court, punitive damages, an accounting of the profits earned by the Counterclaim-Defendants, together with pre-judgment and post-judgment interest, such costs as may be allowed by law and such other and further relief as the Court may deem just and proper.

WHEREFORE, Doubledown prays for a judgment:

1.      Awarding Doubledown monetary damages in the amount of no less than $787,210, together with both pre-judgment and post-judgment interest and all costs allowable by law.

2.      Permanently enjoining and restraining Counterclaim-Defendants, their officers, agents, servants, employees, attorneys, successors or assigns, and all persons or entities acting in concert or participation with them or any of them from the manufacture, distribution, offering for sale, sale, advertising and/or promotion in the United States of (a) any false statements or designations of origin or any other thing calculated or likely to cause confusion or mistake in the mind of the trade or public, or to deceive the trade or public into believing that Counterclaim-Defendants' business and products are in any way associated or affiliated with or related to Doubledown; and (b) any materials that include the Copyrighted Articles.

3.      Directing Counterclaim-Defendants to deliver up for destruction or other disposition, within thirty (30) days of the entry of final judgment herein, any and all materials in Counterclaim-Defendants' possession that bear any designation in violation of Doubledown's rights as decreed herein and all plates, molds, matrices and other means of making reproductions, counterfeits, copies or colorable imitations of plaintiffs' trademarks or copyrighted materials.

4.      Directing Counterclaim-Defendants to file with the Court and serve on counsel for Doubledown, within thirty days after entry of any injunction issued by the Court in this action, a sworn written statement as provided in 15 U.S.C. § 1116.

5.      Directing Counterclaim-Defendants to account to Doubledown for their profits arising from the conduct complained of herein, pursuant to 15 U.S.C. § 1117 and 17 U.S.C. § 504, and entering judgment for three times such profits arising from the conduct

complained of herein, pursuant to 15 U.S.C. § 1117(a), in view of Counterclaim-Defendants' willful violations of Doubledown's rights.

      6.     Awarding Doubledown punitive damages on its claims for unfair competition in violation of New York State law.

      7.     Awarding Doubledown its reasonable attorneys' fees, taxable costs and disbursements of this action, pursuant to 15 U.S.C. § 1117.

      8.     Awarding Doubledown such other and further relief as the Court deems just and proper.

## JURY DEMAND

Doubledown hereby demands a trial by jury on all of its counterclaims to the extent allowed by law and the U.S. Constitution.

Dated:   New York, New York  
         June 2, 2008

                     DORSEY & WHITNEY LLP

                   By:_____  
                     Bruce R. Ewing (BE-0724)  
                     Helene M. Freeman (HF-3066)  
                     Marc S. Reiner (MR-6669)  
                     250 Park Avenue  
                     New York, New York 10177  
                     (212) 415-9200

                     Attorneys for Defendants  
                     Doubledown Media, LLC and Randall Lane

  



**DOUBLEDOWN MEDIA**

October 22, 2007

Mr. Lenny Dykstra
Players Club
510 Walnut Street, Suite 500
Philadelphia, PA 19106

Lenny:

Thank you for an excellent meeting yesterday. This is a very exciting stage in the Players Club Magazine process and we are looking forward to working with you and your associates to bring the magazine to fruition.

This Letter of Agreement outlines the understanding, deal points and responsibilities of the working relationship between Doubledown Media and Players Club as we move forward in the development, execution and the March 1, 2008 launch of Players Club Magazine. When signed by you, this letter will allow us to proceed while we prepare a more formal contract.

## Players Club Responsibilities

**Circulation Development**
Players Club will provide Doubledown Media with the names and addresses for bulk shipping and individual delivery to players in accordance with the circulation timetable.

**Content Input**
Players Club will provide content suggestions and input from the magazine sponsors in accordance with the content timetables. Doubledown Media will adjust that input to fit the tone and flow of the magazine.

**Prompt Approvals**
Players Club will provide approvals in a timely manner in order to accommodate the content development and circulation timetables. Detailed timetables are forthcoming.

## Doubledown Media Responsibilities

**Content**
Doubledown Media will provide original content, as well as edited sponsor content, to Players Club in a timely manner in order to accommodate production timetables. Content includes editorial, design, photography and illustration.

**Distribution**
Based on the circulation input from Players Club, Doubledown Media will execute all distribution of the magazine.

**Advertising Sales and Revenue Sharing**
Doubledown Media will allocate its national advertising sales network to generate advertising revenue from non-partnership companies. Net advertising revenue will be split equally between Players Club and Doubledown Media.

**Marketing Materials**
Doubledown media will assume the development and production of marketing and sales materials necessary to launch the magazine. You will have full approval of the work as it proceeds. Should Players Club want to launch the magazine with a party/event, $25,000 would be pre-paid to cover partial event costs.



*The very best materials must be used, this is very important to me. Thank you*

*Jenny Understood. Will show your sample the stocks for you approval, Lenn. Thanks, Lenn JM*

## Issue Specifications

| | |
|---|---|
| Frequency: | Six times annually |
| Quantity: | 20,000 |
| Trim Size: | 9 inches x 10.8 inches |
| Paper Stock: | Cover/100# Appleton Utopia |
| | Text/45# Bowater Bowbrite |
| Coloration: | Four-color process throughout |
| Paging: | 96 pages + four covers (including 30 advertising pages) |
| Binding: | Perfect bound |
| Distribution: | 20,000 — bulk shipped, mailed and possible newsstand |

## Pricing

Marketing Costs: $100,000.
Marketing costs are due up front and cover the pre-publishing expenses for magazine template development, marketing and media kit development.
Publishing Costs: $1,440,000 / $240,000 per issue for six issues
Publishing costs cover the on-going expenditures of producing six issues of Players Magazine.

## Magazine Payment Schedule

$100,000 to cover marketing costs to be wired to Doubledown Media today
$100,000 due by October 31, 2007.
$260,000, due by December 31, 2007
$360,000, due February 15, 2008
$360,000, due May 15, 2008
$360,000, due August 15, 2008

## Foreign Language Editions

Doubledown can produce foreign language editions of the magazine as needed. Costs for translation, editorial and design rework are estimated to be $15,000 per issue. Production, postage and distribution costs will vary depending on quantity for each country.

Lenny, please let me know if there are any questions, comments or changes to the Letter of agreement. We are anxious to start to work for you and to providing you with a magazine that will impress its audience, its sponsors and that you will be very proud of.

Sincerely,


James M. Gabal
Managing Director, Custom Media, Doubledown Media, LLC

Approved for Players Club by:

*Lenny Dykstra*                    PRESIDENT            10/22/07

Lenny Dykstra                      Title                Date


Approved for Doubledown Media, LLC by:

                                                        10-22-07

Randall Lane                       President            Date


Doubledown Media, LLC    240 West 35th Street, New York, NY 10001

```
------ Forwarded Message
From: Randall Lane ████████████████████
Date: Thu, 20 Mar 2008 18:14:28 -0400
To: Lenny Dykstra ██████████████████████
Conversation: Newsletter contract
Subject: Newsletter contract
```

Lenny,

Should get the newsletter deal on paper. Here are some rough deal points, designed as always to be fair and non-controversial.

-- 50-50 split on net revenues -- this includes newsletter subscriptions, and advertising sponsorships on The Dykstra Report, which we should be successful selling to our current Trader Monthly advertisers.

-- One-year contract, but if we hit certain minimum earnings thresholds for you, it should automatically renew for another 12 months: Year 1: $500,000 for LKD; Year 2: $1 million for LKD; Year 3: $1.5 million for LKD, etc. This gives you assurances that it will be lucrative, and incentivizes us to throw every we have at this newsletter.

-- Chris Frankie will ghost-write...all you do is make the picks. But you have FINAL APPROVAL on everything that goes out under your name.

I'm sure there's lots of smaller stuff to consider, but these strike me as the main points. Our guy can draft (for free) or you can put your big legal hitters on it..best, Randall

--

Randall Lane
President and Editor-in-Chief
Doubledown Media
Trader Monthly * Dealmaker * Corporate Leader Private Air * The Cigar Report * Players Club 240 West 35th Street, 11th Floor New York, NY 10001
212-672-5173


------ End of Forwarded Message
```



Case 1:08-cv-03912-RMB-AJP    Document 23-4    Filed 06/05/2008    Page 1 of 6

# Players Club

'KEEP LIVING THE DREAM

## Chris Paul

**CP3 floats like a butterfly and stings like a Hornet**

# **Players**Club
### KEEP LIVING THE DREAM

# Contents
May 2008 / Vol. 1, No. 2



**64**

## Cover Story

64  ### Living the Dream
**The Man Who Saved New Orleans**
By leading his team to the NBA Playoffs, Hornets guard
Chris Paul has brought hope and pride to a city on the rebound
BY LANG WHITAKER



**90**



**70**

## Features

58  **Earning Power**
Net Assets
The *Players Club* All-Money
All-Stars from the NBA
BY PATRICK SAUER

70  **Off the Field, On the Money**
The Music Man
The National League MVP hopes
to keep the hits coming
BY JIMMY ROLLINS

76  **Fashion**
Smashing!
Tennis star Daniela Hantuchova
gets dressed up for a night out
PHOTOGRAPHY BY BRIAN SMITH

82  **Giving Back**
Barry Zito: Going to Battle
For the Troops
The Giants ace is on a mission to
help wounded vets
BY JONATHAN LESSER

86  **In the Front Row**
He's Got a Habit
Filmmaker Spike Lee brings a
passion for sports to his movies
BY MIKI TURNER

90  **Road Trip**
The Suite Life
In search of the world's most
luxurious hotel penthouses

**FINANCIAL
GUIDE**

**Taking
Measure Of
Your Future**
PAGE 37



18



122



110



**On the Cover**
NBAE/Getty Images

# PC Insider

**18  Players' Choice**
Who's hot in every major sport
B.J. Upton, Ahmad Bradshaw,
Alex Ovechkin, Cristiano Ronaldo,
Tony Kanaan, Jo-Wilfried Tsonga,
Ana Ivanovic, Boo Weekley, Paula Creamer

**44  What's Hot**
The latest and greatest in your world

**46  Golf**
Fred Couples explains how to be a leader
in the locker room

**48  Restaurants**
Keith Hernandez shows you where to eat
like a local when in Manhattan

**50  Video Games**
The Utah Jazz's Kyle Korver reviews
*Call of Duty 4: Modern Warfare*

**52  Mental Health**
How to Outthink a Slump
Recognizing your personality traits will
help you pull out of a nosedive

**54  Better Half**
Tanya Staal
Hurricanes hockey wife stays centered by
keeping upbeat win or lose

# Best of the Best

**110  The Big Man's Bentley**
The Rays' Cliff Floyd loves his Flying Spur

**114  Screen Plays**
A selection of the finest new TVs

**118  Injury-Proof**
The indestructible Olympus Stylus 1030 SW

**120  Listen Up!**
The finest headphones money can buy

**122  Million-Dollar Babies**
Six-figure bling for your wrist

**124  Square Deal**
The hottest and squarest fairway woods

**126  Most Valuable Vines**
Recapping the 2003 Brunello di Montalcino

**128  The Money Game**
Q&A with New York Ranger Scott Gomez

# PlayersClub
### KEEP LIVING THE DREAM

**FOUNDER** Lenny Dykstra

**EDITOR-IN-CHIEF** Randall Lane

**DEPUTY EDITOR** Ty Wenger
**SENIOR EDITOR** Jonathan Lesser
**MANAGING EDITOR** Clifford Blodgett
**ASSOCIATE EDITOR** Mike Ogle

**CONSULTING CREATIVE DIRECTOR** Arthur Hochstein
**DESIGN DIRECTOR** Mitch Shostak
**ART DIRECTORS** Rommel Alama, Corey Kuepfer
**DESIGNER** Jorge Colombo

**CONSULTING DIRECTOR OF PHOTOGRAPHY** Mary Anne Golon
**DIRECTOR OF PHOTOGRAPHY** Lila Garnett
**SENIOR STAFF PHOTOGRAPHER** Ian Spanier
**STAFF PHOTOGRAPHERS** Matthew Furman, Jimmy Nicol
**FASHION DIRECTOR** Jennifer Lee

**EDITORIAL ASSISTANTS** Michael Boles, Chris R. Morgan, David Perry, David Press
**ASSISTANT TO THE EDITOR-IN-CHIEF** Tony Nikolla
**EDITORIAL PRODUCTION DIRECTOR** Helen Barnard
**EDITORIAL PRODUCTION MANAGERS** Pamela Brandt, Caroline Cox

**PRESIDENT SALES AND MARKETING** Richard Skeen 212-920-8446; rskeen@doubledownmedia.com
**PUBLISHER** Wilkie Bushby 212-672-5172; wbushby@doubledownmedia.com
**GENERAL MANAGER** Edward Padin 212-920-8403; epadin@doubledownmedia.com

**SENIOR VICE PRESIDENT, BRANDING AND PARTNERSHIPS** Rachel Pine 212-672-5171; rpine@doubledownmedia.com
**PRESIDENT, ACCESS AND INFLUENCE, MARKETING SOLUTIONS** Patrick Shannon 212-672-5170; pshannon@doubledownmedia.com
**MARKETING DIRECTOR** Steve Hantzarides 646-808-2785; shantzarides@doubledownmedia.com
**CHIEF FINANCIAL OFFICER** Paul Fish 212-920-8427; pfish@doubledownmedia.com
**CIRCULATION DIRECTOR** Nora Pastenkos, 646-723-2164; npastenkos@doubledownmedia.com

**ADVERTISING PRODUCTION MANAGER** Katie Calautti
**ADVERTISING SALES COORDINATOR** Jodi Morena
**EVENTS MANAGERS** Joshua Lane, Rachael Schutzbank

**DIRECTOR, WATCH AND JEWELRY** Katharine Hovey 646-723-2162; khovey@doubledownmedia.com
**DIRECTOR, AVIATION** Scott Stone 212-672-5178; sstone@doubledownmedia.com
**DIRECTOR, TRAVEL AND CARIBBEAN** Henry Watkins 646-808-2800; hwatkins@doubledownmedia.com
**DIRECTOR, REAL ESTATE** Rachel Glazer 646-723-2206; rglazer@doubledownmedia.com
**DIRECTOR, FASHION** Suzanne Coppola 415-839-9505; scoppola@doubledownmedia.com
**DIRECTOR, AUTOMOTIVE, CONSUMER ELECTRONICS AND MEN'S GROOMING** Robert Levine 212-672-5177; rlevine@doubledownmedia.com
**DIRECTOR, CIGARS/THE CIGAR REPORT** Aaron Sigmond 646-723-2176; asigmond@doubledownmedia.com
**ACCOUNT MANAGER, NEW YORK CITY RETAIL AND CIGARS** Tarryn Jacobson 646-808-2786; tjacobson@doubledownmedia.com
**ACCOUNT MANAGER, LIQUOR, WATCHES, ONLINE** Rebecca Rogalski 212-920-8424; rrogalski@doubledownmedia.com
**MANAGING DIRECTOR, CAPITAL MARKETS** Dan Ryan 212-672-5179; dryan@doubledownmedia.com
**ASSOCIATE PUBLISHER/FINANCE** Douglas J. Weber 646-723-2205; dweber@doubledownmedia.com
**DIRECTOR INSURANCE AND FINANCIAL SERVICES** Stephen Acunto 212-920-8412; sacunto@doubledownmedia.com

**ADVERTISING OFFICES**
**ALABAMA** Tami Greer Garner 205-218-8845; tgarner@doubledownmedia.com
**ATLANTA** Richard E. Holcomb 770-740-7120; dholcomb@doubledownmedia.com
**BOSTON/NEW ENGLAND** Mark McGinty 203-256-9596; mmcginty@doubledownmedia.com
**CHICAGO** Ron Slucker, Director of Advertising Solutions, Promotions and Events, 773-935-9396, rslucker@doubledownmedia.com/Stu Opfer 630-832-3600; sopfer@doubledownmedia.com
**DALLAS** Phil Gans 972-991-4994; pgans@doubledownmedia.com
**DETROIT** Rick Pankratz, Dave Irvine, Greg Campbell 248-318-5750; rpankratz@doubledownmedia.com, dirvine@doubledownmedia.com, gcampbell@doubledownmedia.com
**FLORIDA** Daryl Bernstein 305-702-6343; dbernstein@doubledownmedia.com
**LAS VEGAS/ARIZONA** Henry Watkins 646-808-2800; hwatkins@doubledownmedia.com
**LOS ANGELES** Cha Mueller 310-450-1604; cmueller@doubledownmedia.com
**NEBRASKA** Marty Anderson, John Domast 888-223-2473; manderson@doubledownmedia.com, jdomast@doubledownmedia.com
**SAN FRANCISCO** Suzanne Coppola 415-839-9505; scoppola@doubledownmedia.com
**ASIA** Herb Moskowitz 011-852-2838-8702; hmoskowitz@doubledownmedia.com
**EUROPE** Christian Price 011-44-20-7842-9645; cprice@doubledownmedia.com
**MEXICO/CENTRAL AMERICA** Javier Amieva, Alberto Gannez 956-729-0224; jamieva@doubledownmedia.com, agamez@doubledownmedia.com
**SWITZERLAND** Alessandro Indini +41-21-654-4003; aindini@doubledownmedia.com





240 WEST 35TH STREET, 11TH FLOOR,
NEW YORK, NY 10001 • 212-719-9500;
212-719-9555 (FAX)

245 PARK AVENUE, 39TH FLOOR
NEW YORK, NY 10167
(212) 672-1986

PLAYERS CLUB IS PUBLISHED BY
TPC OPERATIONS, IN PARTNERSHIP WITH
DOUBLEDOWN MEDIA. ALL RIGHTS RESERVED.

**FOR SUBSCRIPTIONS CALL 815-734-5821**
**FOR REPRINTS,** usage and other permissions, please contact FosteReprints, 866-879-9144; sales@fostereprints.com
**CANADA POST:** Publications Mail Agreement #40612608. Canada returns to be sent to Bleuchip International, P.O. Box 2542, London, ON N6C 6B2

ISSN 1941-7128

# Barry Zito: Going to Battle For The Troops

The San Francisco Giants pitcher has raised nearly
$1 million with Strikeouts for Troops, which he founded
to bring the "comforts of home" to wounded vets.

By Jonathan Lesser

LIKE SO MANY SOLDIERS BEFORE HIM AND SINCE, MARINE SGT. CHRIS RETURNED FROM IRAQ NOT ONLY injured — his back was broken when his Humvee blew up — but traumatized. In four months recovering at Balboa Naval Regional Medical Center in San Diego, he wouldn't leave his room and barely spoke a word. One of the few things others at the hospital knew about him was that he was a big baseball fan. ★ So when San Francisco Giants pitcher Barry Zito, the founder of Strikeouts for Troops, offered to sponsor a group of Marines recovering at Balboa on a trip to Arizona to see some spring training games and meet some players, it was decided that Sgt. Chris would be among them. ★ "He was literally forced to go on this trip to get out in public," says Richard Williams, an attorney and Marine Corps League

GREG FOSTER / SPORTS ILLUSTRATED



■ **GIVING BACK** / Barry Zito

member in San Diego who organized the travel. "He was a quiet dude. At the games, he didn't even want to go onto the field."

But then came dinner.

As part of the trip, Zito had arranged for about a dozen teammates, along with San Diego Padres ace Jake Peavy, to join the 15 recuperating Marines for dinner. No media, just an intimate few hours, time for the players and the veterans to get to know one another.

Peavy took a seat next to Sgt. Chris – it turns out they're both from Alabama – and before long Sgt. Chris was not only one of the most talkative people in the room, he was smiling and laughing like no one there had ever seen him do. He was having the time of his life.

"The players were rapping with these guys," recalls Williams. "Not talking about, 'Hey, I'm sorry your leg's blown off,' but, 'Hey, what did you do in high school?' Peavy and Sgt. Chris talked about John Deere tractors. It turned out to be a three and a half hour therapy session."

"It's things like that that have an impact," says Zito. "We respect these guys so much. It's fun to be able to shake their hands and say, 'Hey, thank you for what you do. You guys are the real heroes.' "

**S**TRIKEOUTS FOR TROOPS WAS launched in 2005, the brainchild of Cy Young award winner Zito, 29, and his family. The foundation's stated mission is to "benefit our war wounded troops being treated at Walter Reed, Bethesda Naval, and other military hospitals." Zito came up with the concept of giving a certain amount of money per strikeout he gets "to make it more fun for the players to donate and for the fans to track."

Zito will give $500 per K this year (last year he gave $400 for a total of $52,400), and so far he has enlisted more than 50 of his fellow major leaguers to participate (non-pitchers can donate per home run or RBI or simply give a flat amount). The roster includes players whose families have military ties, including Alex Rodriguez, Chipper Jones and Curt Shilling, and those who don't. "We don't have to come up with smoke and mirrors to sell people on this thing," Zito says. "If you enjoy your freedom and you enjoy playing baseball in front of all these fans and living this life that we're so blessed to live here in the United States, show your appreciation to the people who have






MEET THE VETS: Zito's foundation brings recovering veterans out to the ballpark. Right: Zito and Peavy present a check in San Diego. Left: Zito and Nick Swisher at a Christmas fundraising event.

been earning us that freedom since we started here almost 300 years ago."

Strikeouts for Troops has already given out nearly $1 million in grants; and as the story above about the Marines' spring training trip to Arizona illustrates, Zito doesn't

**"We respect them so much. It's fun to be able to shake their hands and say, 'Thank you for what you do. You guys are the real heroes.' "**

just raise money, he raises spirits. He says that as much as his schedule allows, he will continue to spend time with the troops.

"These are Major League Baseball players who are going out of their way to show Marines that athletes care about them," says Williams, "and it means more than just the money. Barry Zito is a phenomenal motivator, and it is so heartening to see him involved with the Marines."

When pondering a foundation to start, Zito knew he wanted to help veterans — "military and baseball, two of the great institutions of this country" — but he wasn't sure of the best way to do it. His long-time publicist, Kathy Jacobson, whom Zito calls "the secret weapon behind this whole deal," researched which veteran needs were not being met. She discovered that the men and women recovering in our military hospitals were lacking the "comforts of home."

PHOTOGRAPHY COURTESY OF STRIKEOUTS FOR TROOPS

**ACE OF HEART:** For every strikeout he records this year, Zito will donate $500 to the foundation. More than 50 other players have joined his cause.

The fact is that if you have a limb blown off, as many patients at Balboa hospital have, it requires multiple surgeries and skin grafts, and while the military will pay for family to be there for the initial surgery, future visits are not covered. "What happens is, families come from Kentucky or Iowa or Alabama and stay for about 10 days," says Williams, who in 2003 started the Injured Marine Fund, which is a beneficiary of Strikeouts for Troops. "They're happy to see their Marine, but then they have to go back to younger siblings, back to work.

"At first the Marine is happy to be alive," Williams says of the first family visit, but after the second and third surgeries, "that's when reality sets in, when depression sets in, when PTSD [post-traumatic stress disorder] sets in, and that's when they need their parents. There's no funding for that."

Strikeouts for Troops gives out its money through grants to carefully selected nonprofit organizations that help wounded soldiers — not just Marines but from all U.S. Armed Forces — and their families. Zito personally covers all over-

**Zito knew he wanted to help war veterans. "Military and baseball," he says. "Two of the great institutions of this country."**

head expenses to ensure that 100 percent of the money donated by the players goes to the men and women who need it.

On the Web site are dozens of testimonials from many of those who have been helped over the past three years, and Zito has read every one. "Aside from meeting the people face to face," he says, "that's the biggest thing for me: reading the difference that we can make."

Strikeouts for Troops has paid for everything from childcare and other living expenses to a special-needs bed for an Army specialist who was permanently disabled by a suicide bomber. But mostly the money goes to keeping family nearby as the soldiers recover. "The theory," Zito says, "is that when you have loved ones at your bedside you can heal a lot better." ★

**strikeoutsfortroops.org**

GETTY IMAGES

PLAYERS CLUB • MAY 2008

# The Suite Life

Private spas? Personal cinemas? Opulent safaris?
A basketball court . . . in your room?
Yes, when the superstar travels, he does so in style —
and with a degree of indulgence that others
might find, well, indulgent.

**BULGARI BALI, BULGARI VILLA**
Bali, Indonesia

90



*(previous spread)*

### BULGARI BALI, BULGARI VILLA
Bali, Indonesia
**OPENED:** 2006 **SIZE:** 14,000 square feet
**BEDS:** Three **PRICE:** $8,000/night
**CONTACT:** 011-62-361-847-1000;
bulgarihotels.com

Admittedly, some of us couldn't point to Bali on a map if our contract extension depended on it. (Hint: It's southwest of Sulawe and right next to Sumbawa.) But there's no time like the present to get to know this (almost) untouched paradise, and this tucked-away three-bedroom villa is the ideal launching pad for that journey. Located on the southwestern end of the island, the retreat resides at the edge of a cliff overlooking the Indian Ocean and features stunning interiors, built with hand-cut volcanic stone and natural lava walls, all uniting in a harmonious balance of indigenous Balinese style and contemporary Italian design.

But really, you don't give a damn about indigenous styles, do you? No, what you'll care about are its elaborate 65-foot-long pool, outdoor meditation pavilion, two living rooms and the private access that ensures no pesky strangers will interrupt you as your revel in your secluded luxury. The Bulgari even provides something called banjar butlers, who are entrusted with serving all your needs with "invisible service." Which actually sounds a bit creepy, but maybe that's just us.

### THE PENINSULA SUITE, PENINSULA HONG KONG
Hong Kong
**OPENED:** 1994 **SIZE:** 4,111 square feet
**BEDS:** One **PRICE:** $8,718/night
**CONTACT:** 866-382-8388;
hongkong.peninsula.com

The Peninsula Hong Kong bills itself the "Grande Dame of the Far East." That would presumably make this eight-room suite — the hotel's largest — her crown jewel, or perhaps her extremely expensive pillbox hat. Regardless, with a private balcony, handmade in-room telescope, and panoramic twenty-sixth-floor views of the city, it's tailor-made for Peeping Toms who like to spy on random people in distant lands.

Better still, no one can spy on you. The Peninsula places a high premium on privacy: Guests at the suite have private access to the hotel's rooftop helipad, allowing them to bypass the main entrance and arrive incognito via chopper. A Rolls-Royce Phantom is available to chauffeur you, unnoticed, as you explore the town. A 24-hour-butler (accessible by valet button on the bedside console) can arrange for most anything your spoiled little heart desires. And then there's the security system: Both the CIA and Britain's MI5 were consulted on the design, and it's outfitted with CCTV security monitors, a guard station and yet another valet button in the bathroom and other tricked-out devices too top-secret to share with common civilians.









### PRESIDENTIAL SUITE, HILTON MOLINO STUCKY

Venice

**OPENED:** June 2007 **SIZE:** 980 square feet
**BEDS:** Three **PRICE** $16,000/night
**CONTACT:** 011-39-041-522-1267;
molinostuckyhilton.com

Sure, the water roads, bridges and gondolas are nice and all — for toursists, maybe — but Venice was never all that when it came to luxury hotels. Until now. Set in the latest celeb hotspot of Giudecca, the restored ultra-luxe Hilton Molino Stucky hotel is the city's newest landmark building, and the Presidential Suite the city's largest. The lavish two-level digs even offer a private observatory with an aerial view that has not been accessible since this nineteenth-century mill was shuttered 50 years ago. The site now boasts 44 windows, private gym, six-person hydro pool, dining room, plus master and guest bedrooms featuring marbled bathrooms with customizable "aroma showers." Of course, that's only good for those into privacy and customized experiences. Those into generic and underwhelming ones? You still have your pick of those in town. .

■ **ROAD TRIP** / World's Finest Hotel Penthouses



### THE ROYAL SUITE, BURJ AL ARAB
Dubai

**OPENED:** 1999 **SIZE:** 8,396 square feet **BEDS:** Two
**PRICE:** $14,980/night **CONTACT:** 011-971-4-301-7400; burj-al-arab.com

It's the Manute Bol of luxury: At 1,053 feet high, the Burj Al
Arab is not only one of the world's most opulent hotels, it's also
the world's tallest. Thus, as you can imagine, the floor-to-ceiling
views of the Dubai coastline from this penthouse suite are
dizzying. It's like God's view, assuming that God has $14,980 a
night to burn. No less impressive are the Carrara marble and
a Goldfinger-like accumulation of 24-karat gold leaf (on the
floors, on the grand staircase, in the bathrooms . . . ).

For even more sensory stimulation, retreat to your private
cinema equipped with a 42-inch plasma screen and a massive
multimedia system. And when you're ready to retire to the
master bedroom's rotating four-poster canopy king (which
also sounds kind of dizzying, and not necessarily in a good
way), you can call upon your on-floor, 24-hour butler for what-
ever you might need: caviar, champagne, an ideal headrest
from the 17 options on the "pillow menu." Or better yet, just
slip down the suite's private elevator and into your chauffeured
Rolls-Royce. Then go to sleep in that.



■ **ROAD TRIP** / World's Finest Hotel Penthouses





## SABORA TENTED CAMP, SINGITA GRUMETI RESERVES

Serengeti Plain, Tanzania

**OPENED** 2005 **SIZE** 750 square feet (alternately, 346,000 acres)
**BEDS** One **PRICE:** $950 per person/night
**CONTACT** 011-27-21-683-3424; singita.com

Spread across 346,000 acres of the western Serengeti, Sabora resides on the famous migratory route for wildebeest, zebra and gazelle. Sit and watch as the herds thunder right past your private deck — and then, when you get bored of that, go back to what you do at home: the camp's six air-conditioned tents boast Wi-Fi, satellite television, DVD players and PlayStation consoles. There's even a tented spa.

If your brand of fun is more outdoorsy, you can take your pick of archery, lawn croquet, badminton, hot-air ballooning, Land Rover game drives and a full-service equestrian center with 16 thoroughbreds and polo horses. And there's no need to kill and cook a gazelle; French chef Laurent Large will feed you quite well.





## HARDWOOD SUITE, PALMS CASINO RESORT

### Las Vegas

**OPENED:** 2005 **SIZE:** 10,000 square feet
**BEDS:** Two **PRICE:** $25,000/night
**CONTACT:** 702-944-3429; palms.com

Do you secretly dream of retiring from your chosen sport to try playing in the NBA? Well, give it up. That's idiotic. Just look at how well that all went for Jordan, when he tried that baseball thing. Still, you can always indulge your "I'm David Lee" fantasies at the Palms' Hardwood Suite, the coolest digs in the 347-room, $650 million fantasy tower of the Palms casino.

The brainchild of George Maloof, owner of both the Palms and the Sacramento Kings, the Hardwood bills itself as the world's only suite with an indoor basketball court. And no Nerf hoops here. We're talking electronic scoreboard, locker room, customized jerseys, referees ($250 for two hours) and, of course, cheerleaders ($260 each for four hours, based on availability). The bi-level suite also features three Murphy beds on the court, where pickup-game losers can be forced to sleep while you dribble around them victoriously. (Winners stay in the two master bedrooms.)

Off the court are a 10-person Jacuzzi, 10 42-inch plasma TVs, an iPod-equipped stereo, a dance floor, poker tables and a wall signed by the likes of Shaq, George Clooney and Justin Timberlake, who cavorted around on this very court during last year's MTV Video Music Awards performance.

DENISE TRUSC





## PENTHOUSE SUITE, THE FAIRMONT SAN FRANCISCO

**San Francisco**

**OPENED:** 1981 **SIZE:** 6,000 square feet
**BEDS:** Three **PRICE:** $12,500/night
**CONTACT:** 866-540-4491
fairmont.com/sanfrancisco

Plenty of penthouses offer the traveling athlete opulent accommodations and access to luxury automobiles. But only the top-level suite at the Fairmont features

all of that . . . and a secret passageway! Located behind bookshelves on the second floor of the library and ending in the master bedroom, the corridor allegedly helped JFK hide his sexual dalliances. In other words, Marilyn Monroe totally performed the walk of shame there.

The floor-through suite also boasts less scandalous amenities, such as a billiard room covered in Persian tiles, a grand piano, an outdoor terrace offering views of San

Francisco's stunning skyline and 24-hour butler and maid service. Originally built as a private residence for financier John Drum, the suite has since hosted everyone from Mick Jagger to the Dalai Lama to then-Secretary of State Edward Stettinius, who drafted the U.N. charter there in 1945. The hotel, meanwhile, withstood the Great San Francisco Fire of 1906 — so it should certainly be able to handle your March Madness party.





### SETAI MIAMI, THE PENTHOUSE
Miami

**OPENED:** 2005 **SIZE:** 6,500 square feet **BEDS:** Four
**PRICE:** $25,000/night **CONTACT:** 305-520-6000; setai.com

We've heard rumors that professional athletes visiting Miami have, in the past, stayed up well past their bedtime and even, at times, entertained a woman or four back in their room. That, of course, doesn't sound like any athletes we know, who are all shy, retiring and extremely chaste. Still, should you one day find yourself in that heady situation, this awe-inspiring penthouse suite with a 3,000-square-foot balcony should serve you well.

A consolidation of what were once two separate accommodations, the Setai penthouse does indeed boast a double-your-pleasure vibe. There are four bedrooms: Two are master suites with king-sized beds, and the fourth, with the queen-sized bed, is often used as the butler's room (because who doesn't travel without a butler?). There are also four bathrooms, two Jacuzzis, even twin living rooms. Alas, there is only one wine cellar (the nerve!), a music room with a lone Steinway piano (how can you play duets?) and one limestone private terrace with a stainless-steel infinity pool and a single coral stone hot tub. All those ladies in one hot tub? The horror! ★

Copyright Office fees are subject to change. For current fees, check the Copyright Office website at www.copyright.gov, write the Copyright Office, or call (202) 707-3000.

**Form TX**
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

**REGISTRATION NUMBER**

_____

TX _____ TXU _____

**EFFECTIVE DATE OF REGISTRATION**

_____

Month _____ Day _____ Year _____

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

**TITLE OF THIS WORK ▼**

Barry Zito: Going to Battle For The Troops

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.    **Title of Collective Work ▼**

If published in a periodical or serial give:  Volume ▼       Number ▼       Issue Date ▼       On Pages ▼

**2**

**a**

**NAME OF AUTHOR ▼**

Doubledown Media, LLC

**DATES OF BIRTH AND DEATH**
Year Born ▼       Year Died ▼

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ U.S.A.
     { Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?      ☐ Yes ☐ No
Pseudonymous?  ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
Article concerning professional baseball player's work with wounded veterans.

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼       Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
     { Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?      ☐ Yes ☐ No
Pseudonymous?  ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼       Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
     { Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?      ☐ Yes ☐ No
Pseudonymous?  ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3**

**a**

**YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED**
2008 ◀ Year
This information must be given in all cases.

**b**

**DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
Complete this information ONLY if this work has been published.
Month ▶ _____ Day ▶ _____ Year ▶ _____
◀ Nation

**4**

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Doubledown Media, LLC
240 W. 35th St., Floor 11
New York, NY 10001

See instructions before completing this space.

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

**DO NOT WRITE HERE OFFICE USE ONLY**

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

---

**MORE ON BACK ▶**
• Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.
• Sign the form at line 8.

DO NOT WRITE HERE

Page 1 of _____ pages

| EXAMINED BY | | FORM TX |
|---|---|---|
| CHECKED BY | | |
| ☐ CORRESPONDENCE ☐ Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☑ No If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: **Previous Registration Number** ▶                    **Year of Registration** ▶

**5**

**DERIVATIVE WORK OR COMPILATION**
**Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

**Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**6**
a
b

See instructions before completing this space.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
**Name** ▼                              **Account Number** ▼

**7**
a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.    Name/Address/Apt/City/State/Zip ▼

Andy Mirsky
2924 M Street, NW, Second Floor
Washington, DC 20007

b

Area code and daytime telephone number ▶ (202) 339-0303             Fax number ▶ (202) 350-9480

Email ▶ andy@mirskylegal.com

**CERTIFICATION\*** I, the undersigned, hereby certify that I am the

Check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of **Doubledown Media, LLC**

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Andy Mirsky                                        Date ▶ May 8, 2008

Handwritten signature ▼

| Certificate will be mailed in window envelope to this address: | Name ▼ ANDREW MIRSKY |
|---|---|
| | Number/Street/Apt ▼ 2924 M St., NW |
| | City/State/Zip ▼ Washington, DC 20007 |

**YOU MUST:**
• Complete all necessary spaces
• Sign your application in space 8

**SEND ALL 3 ELEMENTS IN THE SAME PACKAGE:**
1. Application form
2. Nonrefundable filing fee in check or money order payable to *Register of Copyrights*
3. Deposit material

**MAIL TO:**
Library of Congress
Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6222

**9**

\*17 *USC* §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form TX – Full   Rev: 11/2006   Print: 11/2006 — 30,000   Printed on recycled paper                    U.S. Government Printing Office: 2005-xxx-xxx/60,xxx

# Barry Zito: Going to Battle For The Troops

**The San Francisco Giants pitcher has raised nearly $1 million with Strikeouts for Troops, which he founded to bring the "comforts of home" to wounded vets.**

By Jonathan Lesser

LIKE SO MANY SOLDIERS BEFORE HIM AND SINCE, MARINE SGT. CHRIS RETURNED FROM IRAQ NOT ONLY injured — his back was broken when his Humvee blew up — but traumatized. In four months recovering at Balboa Naval Regional Medical Center in San Diego, he wouldn't leave his room and barely spoke a word. One of the few things others at the hospital knew about him was that he was a big baseball fan. ☆ So when San Francisco Giants pitcher Barry Zito, the founder of Strikeouts for Troops, offered to sponsor a group of Marines recovering at Balboa on a trip to Arizona to see some spring training games and meet some players, it was decided that Sgt. Chris would be among them. ☆ "He was literally forced to go on this trip to get out in public," says Richard Williams, an attorney and Marine Corps League

### ■ GIVING BACK / Barry Zito

member in San Diego who organized the travel. "He was a quiet dude. At the games, he didn't even want to go onto the field."

But then came dinner.

As part of the trip, Zito had arranged for about a dozen teammates, along with San Diego Padres ace Jake Peavy, to join the 15 recuperating Marines for dinner. No media, just an intimate few hours, time for the players and the veterans to get to know one another.

Peavy took a seat next to Sgt. Chris – it turns out they're both from Alabama – and before long Sgt. Chris was not only one of the most talkative people in the room, he was smiling and laughing like no one there had ever seen him do. He was having the time of his life.

"The players were rapping with these guys," recalls Williams. "Not talking about, 'Hey, I'm sorry your leg's blown off,' but, 'Hey, what did you do in high school?' Peavy and Sgt. Chris talked about John Deere tractors. It turned out to be a three and a half hour therapy session."

"It's things like that that have an impact," says Zito. "We respect these guys so much. It's fun to be able to shake their hands and say, 'Hey, thank you for what you do. You guys are the real heroes.'"



CLAIMANT MAKES NO CLAIM TO COPYRIGHT IN PHOTOGRAPHS OR OTHER ART




MEET THE VETS: Zito's foundation brings recovering veterans out to the ballpark. Right: Zito and Peavy present a check in San Diego. Left: Zito and Nick Swisher at a Christmas fundraising event.

S TRIKEOUTS FOR TROOPS WAS launched in 2005, the brainchild of Cy Young award winner Zito, 29, and his family. The foundation's stated mission is to "benefit our war wounded troops being treated at Walter Reed, Bethesda Naval, and other military hospitals." Zito came up with the concept of giving a certain amount of money per strikeout he gets "to make it more fun for the players to donate and for the fans to track."

Zito will give $500 per K this year (last year he gave $400 for a total of $52,400), and so far he has enlisted more than 50 of his fellow major leaguers to participate (non-pitchers can donate per home run or RBI or simply give a flat amount). The roster includes players whose families have military ties, including Alex Rodriguez, Chipper Jones and Curt Shilling, and those who don't. "We don't have to come up with smoke and mirrors to sell people on this thing." Zito says. "If you enjoy your freedom and you enjoy playing baseball in front of all these fans and living this life that we're so blessed to live here in the United States, show your appreciation to the people who have

been earning us that freedom since we started here almost 300 years ago."

Strikeouts for Troops has already given out nearly $1 million in grants; and as the story above about the Marines' spring training trip to Arizona illustrates, Zito doesn't

**"We respect them so much. It's fun to be able to shake their hands and say, 'Thank you for what you do. You guys are the real heroes.'"**

just raise money, he raises spirits. He says that as much as his schedule allows, he will continue to spend time with the troops.

"These are Major League Baseball players who are going out of their way to show Marines that athletes care about them," says Williams, "and it means more than just the money. Barry Zito is a phenomenal motivator, and it is so heartening to see him involved with the Marines."

When pondering a foundation to start, Zito knew he wanted to help veterans — "military and baseball, two of the great institutions of this country" — but he wasn't sure of the best way to do it. His long-time publicist, Kathy Jacobson, whom Zito calls "the secret weapon behind this whole deal," researched which veteran needs were not being met. She discovered that the men and women recovering in our military hospitals were lacking the "comforts of home."

PHOTOGRAPHY COURTESY OF STRIKEOUTS FOR TROOPS



CLAIMANT MAKES NO CLAIM TO COPYRIGHT IN PHOTOGRAPHS OR OTHER ART

**ACE OF HEART:** For every strikeout he records this year, Zito will donate $500 to the foundation. More than 50 other players have joined his cause.



GETTY IMAGES

The fact is that if you have a limb blown off, as many patients at Balboa hospital have, it requires multiple surgeries and skin grafts, and while the military will pay for family to be there for the initial surgery, future visits are not covered. "What happens is, families come from Kentucky or Iowa or Alabama and stay for about 10 days," says Williams, who in 2003 started the Injured Marine Fund, which is a beneficiary of Strikeouts for Troops. "They're happy to see their Marine, but then they have to go back to younger siblings, back to work.

"At first the Marine is happy to be alive," Williams says of the first family visit, but after the second and third surgeries, "that's when reality sets in, when depression sets in, when PTSD [post-traumatic stress disorder] sets in, and that's when they need their parents. There's no funding for that."

Strikeouts for Troops gives out its money through grants to carefully selected nonprofit organizations that help wounded soldiers — not just Marines but from all U.S. Armed Forces — and their families. Zito personally covers all over-

**Zito knew he wanted to help war veterans. "Military and baseball," he says. "Two of the great institutions of this country."**

head expenses to ensure that 100 percent of the money donated by the players goes to the men and women who need it.

On the Web site are dozens of testimonials from many of those who have been helped over the past three years, and Zito has read every one. "Aside from meeting the people face to face," he says, "that's the biggest thing for me: reading the difference that we can make."

Strikeouts for Troops has paid for everything from childcare and other living expenses to a special-needs bed for an Army specialist who was permanently disabled by a suicide bomber. But mostly the money goes to keeping family nearby as the soldiers recover. "The theory," Zito says, "is that when you have loved ones at your bedside you can heal a lot better." ★

**strikeoutsfortroops.org**

Copyright Office fees are subject to change.
For current fees, check the Copyright Office
website at www.copyright.gov, write the Copy-
right Office, or call (202) 707-3000.

**Form TX**
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

_____

TX      TXU

EFFECTIVE DATE OF REGISTRATION

_____ _____ _____
Month     Day     Year

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

## 1

**TITLE OF THIS WORK ▼**
ROAD TRIP / World's Finest Hotel Penthouses

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.     **Title of Collective Work ▼**

If published in a periodical or serial give: **Volume ▼**    **Number ▼**    **Issue Date ▼**    **On Pages ▼**

## 2

**a**

**NAME OF AUTHOR ▼**
Doubledown Media, LLC

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ U.S.A.
    { Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
Article concerning world's finest hotel penthouses.

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
    { Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
    { Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

## 3

**a** **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
2008 ◀ Year

**b** **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK** Complete this information ONLY if this work has been published.
Month ▶ _____ Day ▶ _____ Year ▶ _____ ◀ Nation

## 4

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Doubledown Media, LLC
240 W. 35th St., Floor 11
New York, NY 10001

See instructions before completing this space.

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

DO NOT WRITE HERE
OFFICE USE ONLY

**MORE ON BACK ▶**   • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
    • See detailed instructions.     • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of _____ pages

| EXAMINED BY | | FORM TX |
| --- | --- | --- |
| CHECKED BY | | |
| | CORRESPONDENCE Yes | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
[ ] Yes  ☑ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: **Previous Registration Number** ▶        **Year of Registration** ▶

**5**

**DERIVATIVE WORK OR COMPILATION**
**Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

**a**

**Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

See instructions before completing this space.

**6**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
**Name** ▼        **Account Number** ▼

**a**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.    Name/Address/Apt/City/State/Zip ▼

Andy Mirsky
2924 M Street, NW, Second Floor
Washington, DC 20007

Area code and daytime telephone number ▶ (202) 339-0303        Fax number ▶ (202) 350-9480
Email ▶
andy@mirskylegal.com

**b**

**7**

**CERTIFICATION\*** I, the undersigned, hereby certify that I am the

Check only one ▶
- ☐ author
- ☐ other copyright claimant
- ☐ owner of exclusive right(s)
- ☑ authorized agent of  Doubledown Media, LLC

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Andy Mirsky        Date ▶ May 8, 2008

Handwritten signature ▼

| Certificate will be mailed in window envelope to this address: | Name ▼ ANDREW MIRSKY |
| --- | --- |
| | Number/Street/Apt ▼ 2924 M Street, NW |
| | City/State/Zip ▼ Washington, DC 20007 |

**YOU MUST:**
- Complete all necessary spaces
- Sign your application in space 8

**SEND ALL 3 ELEMENTS IN THE SAME PACKAGE:**
1. Application form
2. Nonrefundable filing fee in check or money order payable to Register of Copyrights
3. Deposit material

**MAIL TO:**
Library of Congress
Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6222

**9**

\*17 USC §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form TX—Full  Rev: 11/2006  Print: 11/2006—39,000  Printed on recycled paper        U.S. Government Printing Office: 2006-xx-xxx/60.xxx

■ **ROAD TRIP** / World's Finest Hotel Penthouses

# The Suite Life

Private spas? Personal cinemas? Opulent safaris?
A basketball court . . . in your room?
Yes, when the superstar travels, he does so in style —
and with a degree of indulgence that others
might find, well, indulgent.

CLAIMANT MAKES NO CLAIM TO COPYRIGHT
IN PHOTOGRAPHS OR OTHER ART

**BULGARI BALI, BULGARI VILLA**
Bali, Indonesia

# ☐ ROAD TRIP / World's Finest Hotel Penthouses



CLAIMANT MAKES NO CLAIM TO COPYRIGHT IN PHOTOGRAPHS OR OTHER ART

*(previous spread)*

**Bali, Indonesia**

2006    **14,000 square feet**

**Three    $8,000/night**

**011-62-361-847-1000; bulgarihotels.com**

Admittedly, some of us couldn't point to Bali on a map if our contract extension depended on it. (Hint: It's southwest of Sulawe and right next to Sumbawa.) But there's no time like the present to get to know this (almost) untouched paradise, and this tucked-away three-bedroom villa is the ideal launching pad for that journey. Located on the southwestern end of the island, the retreat resides at the edge of a cliff overlooking the Indian Ocean and features stunning interiors, built with hand-cut volcanic stone and natural lava walls, all uniting in a harmonious balance of indigenous Balinese style and contemporary Italian design.

But really, you don't give a damn about indigenous styles, do you? No, what you'll care about are its elaborate 65-foot-long pool, outdoor meditation pavilion, two living rooms and the private access that ensures no pesky strangers will interrupt you as your revel in your secluded luxury. The Bulgari even provides something called banjar butlers, who are entrusted with serving all your needs with "invisible service." Which actually sounds a bit creepy, but maybe that's just us.

**Hong Kong**

1994    **4,111 square feet**

**One    $8,718/night    866-382-8388; hongkong.peninsula.com**

The Peninsula Hong Kong bills itself the "Grande Dame of the Far East." That would presumably make this eight-room suite — the hotel's largest — her crown jewel, or perhaps her extremely expensive pillbox hat. Regardless, with a private balcony, handmade in-room telescope, and panoramic twenty-sixth-floor views of the city, it's tailor-made for Peeping Toms who like to spy on random people in distant lands.

Better still, no one can spy on you. The Peninsula places a high premium on privacy: Guests at the suite have private access to the hotel's rooftop helipad, allowing them to bypass the main entrance and arrive incognito via chopper. A Rolls-Royce Phantom is available to chauffeur you, unnoticed, as you explore the town. A 24-hour-butler (accessible by valet button on the bedside console) can arrange for most anything your spoiled little heart desires. And then there's the security system: Both the CIA and Britain's MI5 were consulted on the design, and it's outfitted with CCTV security monitors, a guard station and yet another valet button in the bathroom and other tricked-out devices too top-secret to share with common civilians.



CLAIMANT MAKES NO CLAIM TO COPYRIGHT IN PHOTOGRAPHS OR OTHER ART

PRESIDENTIAL SUITE, HILTON MOLINO STUCKY

**Venice**

June 2007 • 980 square feet

Three • $16,000/night

011-39-041-522-1267;

molinostuckyhilton.com

Sure, the water roads, bridges and gondolas are nice and all — for toursists, maybe — but Venice was never all that when it came to luxury hotels. Until now. Set in the latest celeb hotspot of Giudecca, the restored ultra-luxe Hilton Molino Stucky hotel is the city's newest landmark building, and the Presidential Suite the city's largest. The lavish two-level digs even offer a private observatory with an aerial view that has not been accessible since this nineteenth-century mill was shuttered 50 years ago. The site now boasts 44 windows, private gym, six-person hydro pool, dining room, plus master and guest bedrooms featuring marbled bathrooms with customizable "aroma showers." Of course, that's only good for those into privacy and customized experiences. Those into generic and underwhelming ones? You still have your pick of those in town.

## ROAD TRIP / World's Finest Hotel Penthouses





CLAIMANT MAKES NO CLAIM TO COPYRIGHT IN PHOTOGRAPHS OR OTHER ART



**Dubai**

1999    8,396 square feet    Two

$14,980/night    011-971-4-301-7400; burj-al-arab.com

It's the Manute Bol of luxury: At 1,053 feet high, the Burj Al Arab is not only one of the world's most opulent hotels, it's also the world's tallest. Thus, as you can imagine, the floor-to-ceiling views of the Dubai coastline from this penthouse suite are dizzying. It's like God's view, assuming that God has $14,980 a night to burn. No less impressive are the Carrara marble and a Goldfinger-like accumulation of 24-karat gold leaf (on the floors, on the grand staircase, in the bathrooms . . . ).

For even more sensory stimulation, retreat to your private cinema equipped with a 42-inch plasma screen and a massive multimedia system. And when you're ready to retire to the master bedroom's rotating four-poster canopy king (which also sounds kind of dizzying, and not necessarily in a good way), you can call upon your on-floor, 24-hour butler for whatever you might need: caviar, champagne, an ideal headrest from the 17 options on the "pillow menu." Or better yet, just slip down the suite's private elevator and into your chauffeured Rolls-Royce. Then go to sleep in that.





**SABORA TENTED CAMP, SINGITA GRUMETI RESERVES**
**Serengeti Plain, Tanzania**
**2005 750 square feet (alternately, 346,000 acres)**
**One $950 per person/night**
**011-27-21-683-3424; singita.com**

Spread across 346,000 acres of the western Serengeti, Sabora resides on the famous migratory route for wildebeest, zebra and gazelle. Sit and watch as the herds thunder right past your private deck — and then, when you get bored of that, go back to what you do at home: the camp's six air-conditioned tents boast Wi-Fi, satellite television, DVD players and PlayStation consoles. There's even a tented spa.

If your brand of fun is more outdoorsy, you can take your pick of archery, lawn croquet, badminton, hot-air ballooning, Land Rover game drives and a full-service equestrian center with 16 thoroughbreds and polo horses. And there's no need to kill and cook a gazelle; French chef Laurent Large will feed you quite well.

CLAIMANT MAKES NO CLAIM TO COPYRIGHT IN PHOTOGRAPHS OR OTHER ART



**ROAD TRIP** / World's Finest Hotel Penthouses

**Las Vegas**

2005    10,000 square feet
Two    $25,000/night
702-944-3429; palms.com

Do you secretly dream of retiring from your chosen sport to try playing in the NBA? Well, give it up. That's idiotic. Just look at how well that all went for Jordan, when he tried that baseball thing. Still, you can always indulge your "I'm David Lee" fantasies at the Palms' Hardwood Suite, the coolest digs in the 347-room, $650 million fantasy tower of the Palms casino.

The brainchild of George Maloof, owner of both the Palms and the Sacramento Kings, the Hardwood bills itself as the world's only suite with an indoor basketball court. And no Nerf hoops here. We're talking electronic scoreboard, locker room, customized jerseys, referees ($250 for two hours) and, of course, cheerleaders ($260 each for four hours, based on availability). The bi-level suite also features three Murphy beds on the court, where pickup-game losers can be forced to sleep while you dribble around them victoriously. (Winners stay in the two master bedrooms.)

Off the court are a 10-person Jacuzzi, 10 42-inch plasma TVs, an iPod-equipped stereo, a dance floor, poker tables and a wall signed by the likes of Shaq, George Clooney and Justin Timberlake, who cavorted around on this very court during last year's MTV Video Music Awards performance.

CLAIMANT MAKES NO CLAIM TO COPYRIGHT IN PHOTOGRAPHS OR OTHER ART



## ROAD TRIP / World's Finest Hotel Penthouses

CLAIMANT MAKES NO CLAIM TO COPYRIGHT IN PHOTOGRAPHS OR OTHER ART

PENTHOUSE SUITE, THE FAIRMONT SAN FRANCISCO

**San Francisco**
1981    6,000 square feet
Three    $12,500/night
866-540-4491
fairmont.com/sanfrancisco

Plenty of penthouses offer the traveling athlete opulent accommodations and access to luxury automobiles. But only the top-level suite at the Fairmont features

all of that . . . and a secret passageway! Located behind bookshelves on the second floor of the library and ending in the master bedroom, the corridor allegedly helped JFK hide his sexual dalliances. In other words, Marilyn Monroe totally performed the walk of shame there.

The floor-through suite also boasts less scandalous amenities, such as a billiard room covered in Persian tiles, a grand piano, an outdoor terrace offering views of San

Francisco's stunning skyline and 24-hour butler and maid service. Originally built as a private residence for financier John Drum, the suite has since hosted everyone from Mick Jagger to the Dalai Lama to then-Secretary of State Edward Stettinius, who drafted the U.N. charter there in 1945. The hotel, meanwhile, withstood the Great San Francisco Fire of 1906 — and the preceding earthquake — so it should certainly be able to handle your March Madness party.



CLAIMANT MAKES NO CLAIM TO COPYRIGHT
IN PHOTOGRAPHS OR OTHER ART

SETAI MIAMI, THE PENTHOUSE

**Miami**

2005    **6,500 square feet**    **Four**    **$25,000/night**    **305-520-6000; setai.com**

We've heard rumors that professional athletes visiting Miami have, in the past, stayed up well past their bedtime and even, at times, entertained a woman or four back in their room. That, of course, doesn't sound like any athletes we know, who are all shy, retiring and extremely chaste. Still, should you one day find yourself in that heady situation, this awe-inspiring penthouse suite with a 3,000-square-foot balcony should serve you well.

A consolidation of what were once two separate accommodations, the Setai penthouse does indeed boast a double-your-pleasure vibe. There are four bedrooms: Two are master suites with king-sized beds, and the fourth, with the queen-sized bed, is often used as the butler's room (because who doesn't travel without a butler?). There are also four bathrooms, two Jacuzzis, even twin living rooms. Alas, there is only one wine cellar (the nerve!), a music room with a lone Steinway piano (how can you play duets?) and one limestone private terrace with a stainless-steel infinity pool and a single coral stone hot tub. All those ladies in one hot tub? The horror! ★